**SPINDELFABRIK SUESSEN-SCHURR, STAHLECKER & GRILL GmbH, Hans Stahlecker, and Fritz Stahlecker, Plaintiffs,**

v.

**SAVIO S.p.A. and American Savio Corporation, Defendants.**

No. C-C-88-139-P

United States District Court,
W.D. North Carolina,
Charlotte Division.

Sept. 6, 1991.

Charles B. Park, III, Joell T. Turner, Bell Seltzer Park & Gibson, Charlotte, N.C., for plaintiffs.

Edgar Love III, Kennedy Covington Lobdell & Hickman, Charlotte, N.C., George P. Hoare, Jr., Hedman Gibson Costigan & Hoare, P.C., New York City, for defendants.

MEMORANDUM OF DECISION

ROBERT D. POTTER, District Judge.

### FINDINGS OF FACT

1. This is a patent infringement action in which the Plaintiffs claim that the Defendants have infringed Claim 18 of U.S. Patent No. 4,059,946 [hereinafter the '946 Patent]. Plaintiffs' Exhibit ["PX"] 273.

2. Subject matter jurisdiction, *in personam* jurisdiction, and propriety of venue are all admitted. The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1338(a).

3. Defendants have filed two counterclaims. The first is for a declaratory judgment that Claim 18 is not infringed, invalid, and unenforceable. The second is based on the antitrust laws. Discovery and trial as to the antitrust claim have been severed and stayed.

4. The issues of infringement, validity, and unenforceability of Claim 18 were tried before this Court at Charlotte, North Carolina without a jury on October 29, 30, and 31, and November 1, 2, 5, and 6, 1990. Post–Trial briefs have been filed and a final hearing was held May 31, 1991. Plaintiffs were represented by Bell, Seltzer, Park and Gibson, Attorneys at Law. Defendants were represented by Kennedy, Covington, Lobdell & Hickman of the North Carolina Bar, and Hedman, Gibson, Costigan & Hoare, P.C. of the New York Bar.

5. The damage issue has been deferred by stipulation of the parties, approved by this Court.

6. The '946 Patent was issued on November 29, 1977 on application Serial No. 637,050 filed on December 2, 1975, and is part of the open-end rotor spin technology used in the textile industry.

7. The system is used for mending yarn breaks, a process commonly referred to as "piecing."

8. The Plaintiffs have asserted that two different systems of the Defendants' infringe Claim 18 of the '946 Patent. The Defendant's allegedly infringing systems will be referred to as the "old FRS system [hereinafter "OFRS"] and the "new FRS system" it also referred to as the "modified FRS" [hereinafter "NFRS"].

9. The individual Plaintiffs are two brothers, Hans Stahlecker and Fritz Stahlecker, citizens of Germany and joint owners of the Patent in suit.

10. The corporate Plaintiffs Spindelfabrik Suessen–Schurr, Stahlecker & Grill GmbH are hereinafter referred to as "Suessen." The transcript will be referred to as "Tr."

11. Suessen is a German corporation located in Suessen, Germany, and is the exclusive licensee of the Patent in suit. One of the principal products of Suessen is rotor spin boxes for open-end rotor spinning machines. [Tr. 25; 146–148].

12. Hans Stahlecker is the chief executive officer of Suessen. [Tr. 146].

13. Fritz Stahlecker is the chief executive officer of Wilhelm Stahlecker GmbH [WST] which is not a party to this litigation. WST conducts research, development, and engineering in the field of open-end spinning for Suessen under a contractual arrangement. [Tr. 23–24].

14. Fritz Stahlecker and Hans Stahlecker own the entire right and interest to the '946 Patent and in WST. [Tr. 146; 23; PX 274, Paper No. 8].

15. Suessen does not manufacture complete open-end rotor spinning machines, but manufactures components thereof. Suessen's main business in the open-end rotor spinning field is the production and sale of vital components for open-end rotor spinning machines. One such component is the spinbox. [Tr. 146–147].

16. Defendant Savio S.p.A. [hereinafter "Savio"] is a corporation organized and existing under the laws of Italy, and has its principal place of business in Pordenone, Italy. [Tr. 686].

17. Defendant American Savio Corporation [hereinafter "American Savio"] is a corporation organized and existing under the laws of the State of North Carolina, and has its principal place of business in Charlotte, North Carolina [Docket Entry

54]. [Docket Entry will be referred to as "DE" hereinafter].

18. Savio is a manufacturer of textile machinery, including the accused systems of Defendants' FRS machines. [Tr. 686]. American Savio is the exclusive distributor of Savio's textile machines in the United States. [Tr. 793]. It is jointly owned by Savio and ENI, Savio's Italian parent, and is in the business of selling, erecting, and servicing Savio's machines in the United States.

19. Among these machines and in issue here are two versions of the Savio FRS automated open-end rotor spinning machine, which are manufactured by Savio in Italy, sold by Savio to American Savio, and exclusively distributed by American Savio in the United States. [Tavazani Conf. Tr. 3-4].

*Open End Rotor Spinning*

20. Referring to Fig. 1, *infra* p. 845, in open-end spinning, a continuous strand of untwisted loosely assembled fibers (called sliver) is drawn into the system by means of a feed roller which, in turn, feeds the sliver to a comber or opening roll. The comber roll has teeth on the outside and rotates at a high rate of speed, 5,000 to 8,000 r.p.m., separating individual fibers of the sliver and directing these fibers through a feed tube or fiber transfer tube into a cup-shaped rotor with an interior annular groove. This process occurs within 5 milliseconds. The rotor is usually confined in an underpressure (vacuum) chamber, and rotates at very high speeds feeding individual fibers combed from the sliver

through the feed tube by action of the vacuum in the spinning chamber. The fibers fed to the interior of the rotor are directed by centrifugal force into the rotor groove where they form a ring of fibers. During spinning, twist is continuously inserted into this ring of fibers. These fibers are then pulled out of the rotor groove in the form of twisted yarn, while at the same time, the spinning chamber containing the ring of fibers is continuously replenished with new fibers from the feed tube. [Tr. 32-37; PX 500, pp. 8-9]. In another version, the separated fibers are drawn through the feed tube from a vacuum generated by perforated holes in the rotor or by an independent vacuum source. [Tr. 119-125; PX 327, 328].

21. In order to start this continuous spinning operation, a length of twisted yarn is inserted down into the yarn withdrawal tube and into contact with the fiber ring where it attaches itself to a point on the fiber ring and begins to insert twist into the fiber ring at that point. Upon attachment (piecing), the inserted twisted yarn end is then pulled out of the yarn withdrawal tube, bringing the newly formed twisted yarn with it, and spinning is restarted. This is called "start-spinning" and the area where the yarn end is joined with the fiber ring is known as the "piecing point" [PX 500, p. 9; Tr. 37; 576-77].

22. From the rotor grooves, the fibers are twisted and drawn out of the rotor through an extraction tube as yarn. This yarn is then transferred by rollers to the yarn package.

Yarn to Minder

SPINNING ROTOR DRIVE

YARN WITHDRAWAL TUBE

ROTOR

FIBER FEED TUBE

Fiber Flow

TWIST

FEED ROLL

Sliver Input

COMBER ROLL

TRASH TO WASTE

COMBER ROLL DRIVE

FIGURE 1

23. If there is a yarn break the spinning process is interrupted and the twisted yarn separates from the ring of fibers in the groove of the rotor. The sliver feed stops, but the comber roll continues to rotate. Depending on the length of time feeding is stopped, the lead end of the sliver may be damaged and the fibers broken or shortened by the action of the comber roll. The lead end of the sliver is called the fiber "beard" or "tuft." [PX 500, p. 10; Tr. 559–61].

24. In commercial open-end spinning operations, when a yarn breaks, a detector generates a signal which causes the supply roller to be stopped. In this manner, no additional sections of fiber are fed to the comber roll; however, fibers are still being transported into the rotor because the remaining fiber beard continues being combed out. These fibers end up in the spinning rotor. Before a piecing operation is performed, the spinning rotor is stopped for a brief period of time. [Tr. 39–40]. The opening or comber roll continues to turn. [Tr. 41]. There is necessarily a lapse of time between the moment of break and the moment at which a patrolling operator or an automatic traveling piecer learns of the break and begins to restart spinning by piecing up. This lapse of time necessarily varies depending upon the whereabouts of the operator or automatic traveling piec-

er at the moment of the break, how long it takes to recognize the existence of the break, and other factors. Because of this time variable, when piecing is ultimately initiated, the nature (i.e., the amount of fibers remaining on the comber roll versus the amount of fibers which have already been combed out by the continuously operating comber roll after the sliver feed was stopped) of the constantly aging fiber beard is unknown. If fibers from this unknown fiber beard are then deposited in the rotor groove so as to be used in forming the ring of fibers necessary for piecing up, the piecing point itself will thus include an unknown quantity of fibers, and the resulting piecing points will vary in size from piecing to piecing depending upon how long the fiber beard happened to be when combed out. [PX 500, p. 10; Tr. 36, 46–47, 50; PX 273, Col. 2, L. 9–26].

25. Thus, commercial spinners needed a system for use on open-end spinning machines to eliminate an unknown, inconsistent quantity of fibers from the fiber beard being fed into the rotor where they formed the ring of fibers and are then incorporated into the piecing point. [Tr. 46–47]. An inconsistent quantity of fibers in the ring typically resulted in piecing points which were either too thin, and thus prone to break, requiring further piecing by the op-

erator, or which were undesirably too thick. When such points were too thick, and where quality yarn was required, the package of spun yarn would typically be taken to another machine for rewinding to still another package, during which the thick spots would be identified, cut out, and replaced with a knot. Such knots, though smaller than piecing points, were themselves still considered to be defects, in that they were identifiable in fabrics made from the yarn. [Tr. 38–39].

*Development of the Solution*

26. In 1971, Suessen introduced to the trade its Fritz Stahlecker/WST developed open-end "Spintester" featuring the "Twin Disc" bearing invention. This development was a breakthrough in open-end spinning technology in that its use permitted a quantum jump in spinning rotor speeds of up to 100,000 r.p.m. or more. With the advent of this new bearing technology, the need for automation of the open-end piecing process became paramount, since manual piecing at such high speeds would be impossible. [Tr. 42–45].

27. Thus, work was begun as early as 1972 by Fritz Stahlecker and WST to automate the piecing process. In its conceptual form, the automation process, which WST dubbed "Spincat" and "CleanCat," was to involve robots designed to be mounted on rails and travel the length of an open-end spinning machine, typically equipped with about 200 spinboxes. The Cleancat would be adapted to travel along and automatically clean the spinboxes, as required. The Spincat would be adapted to travel along and automatically piece up stopped spinning positions, as required. [Tr. 45–49; 61–63].

28. In the ensuing three-year period (1972–1975) work commenced at WST to begin designing and building a series of prototype robots directed to accomplishing these various automated functions. The earlier prototypes were directed to solving problems associated with the robotic Spincat tasks of stopping the winding package at the disabled spinning position; locating the yarn end on the package and gaining control over it; preparing a proper length of the yarn end; positioning the yarn end at the opening of the yarn exit tube of the spinbox for reinsertion into the spinbox; feeding the correct length of yarn into the spinbox for piecing; restarting the sliver feed; withdrawing the yarn after piecing; restarting the package winding operation; and transferring the yarn back to the spinning machine for resumption of normal spinning. [Tr. 45–49].

29. The process of solving this multitude of problems resulted in a considerable number of inventions for Fritz Stahlecker and his team of engineers at WST. Concomitantly, they filed for and were issued a significant number of patents. Among these, for example, are U.S. Patent Nos. 3,962,855, 3,950,926, 3,942,311, and 3,924,-394 [PX 212; 211; 210; 208], which relate variously to locating the broken end on the package and preparing it for reintroduction into the rotor. These U.S. Patents are based on corresponding German applications filed in 1973. [Tr. 963–64, 967].

30. Another of the many patents which resulted from this work is U.S. Patent No. 3,987,610 [hereinafter the '610 Patent] [PX 155A], which likewise is based on a corresponding German patent filed in 1973. This German patent is also referred to and described in the specification of the '946 Patent in suit. The invention protected by the '610 Patent represents a prior attempt to solve the problem of inconsistent piecing points. However, it achieved only modest success. It is directed to the correlation of the runup of the sliver feed with the runup of the rotor speed. Such sliver feed runup can be accomplished according to a smooth controlled curve. [PX 155A, Fig. 1 of the '610 Patent]. Alternatively, it can be accomplished by stepwise approximation wherein the sliver feed drive is alternately energized and deenergized in a so-called "stutter" manner. [PX 155A, Fig. 2 of the '610 Patent]. The sliver feed itself, however, does not start and stop, but only alternates periods of acceleration with periods of constant speed. [Tr. 71–72, 99–102].

Figs. 1 & 2 of the '610 Patent:

Fig.1

Fig.2

31. Fritz Stahlecker recognized the problems in obtaining uniform piecing points, particularly with higher speed open-end rotor spinning machines, when Suessen's "Twin Disc" development was unveiled. Having done so, Fritz Stahlecker came to the realization very early in the Spincat development project that in order to get consistency in piecing points from piecing to piecing at the same spinning position and, further, piecing point consistency from spinning position to spinning position, something would have to be done to address the problem of the unknown, aging fiber beard and its ubiquitous negative effect in obtaining piecing points of consistently uniform size. To this end he conceived that his automatic piecer would need the ability to gain control over the quantity of fibers in the fiber ring at the moment the piecing point is formed. He further conceived that this could be achieved in the piecing sequence by first forming a totally new fiber beard, while eliminating the old, unknown, aged fiber beard from the system, and thereafter in a controlled, known time period, start feeding fibers into the rotor to form a new, controlled fiber ring, and then introducing the yarn end into contact with that controlled fiber ring. By doing this, the fiber ring would now have the same quantity of

fibers provided to it from the new, known fiber beard every time the piecing sequence was performed. [Tr. 54–61].

32. Having realized that uniformity of the fiber beard was obtainable with proper timing during the piecing sequence, it became apparent to Fritz Stahlecker and his WST co-inventors of the '946 Patent, Böttcher and Schulz, that such a properly timed piecing sequence was readily achievable with an apparatus or automatic piecer which would (1) always perform the sequence in the same manner within a consistent, known time period, and (2) perform the necessary steps in the coordinated manner required by high spinning speeds. To this end, therefore, electromechanical controls consisting of a combination of electrical circuits and a set of cams for accomplishing these functions were designed in the latter half of 1974 and incorporated into still another Spincat prototype. [Tr. 54–61; DX 401 Day 2, pp. 49–51].

33. The Stahlecker, et al. concept of achieving uniform piecings thus merged with the concept of piecing automation. As a result, the WST research team developed the first technique for producing consistent piecing points of acceptable quality in open-end rotor spinning machines. This technique at the same time readily lent itself to automation even on high speed open-end rotor spinning machines. [Tr. 60–61].

*The '946 Patent–In–Suit*

34. Plaintiffs' U.S. Letters Patent No. 4,059,946 ['946], the Patent in suit, is entitled "Method and Apparatus for Start–Spinning a Thread on open-end Spinning Units." [PX 273].

35. The '946 Patent issued on November 29, 1977, on application Serial No. 637,-050 filed in the United States Patent and Trademark Office on December 2, 1975, in the name of Dieter Böttcher, Heinz Schulz and Plaintiff, Fritz Stahlecker, all citizens of Germany. [PX 273; Tr. 69].

36. On December 2, 1975, pursuant to 35 U.S.C. § 119, the applicants for the '946 Patent claimed in connection with their application the right of priority of West German Patent Application Serial No. 24 58 042, filed in West Germany on December 7, 1974, and simultaneously therewith, filed in the United States Patent and Trademark Office a certified copy of the original west German application, specification and drawings showing that the application was duly filed in the West German Patent Office on December 7, 1974. [PX 273; PX 274].

37. Pursuant to 35 U.S.C. § 119, the '946 application is properly considered as having a U.S. filing date of December 7, 1974. [PX 500, p. 4].

38. The invention protected by the '946 Patent has for its object the provision of a method and apparatus for providing precise control of the fiber feed during the restart of the spinning operation at an individual spinning position so that the quantity of fibers fed for forming the ring of fibers in the rotor groove to which the broken end is to be placed can be controlled to thereby obtain uniform, quality yarn piecing points—that is, piecing points which closely match the appearance and strength of the yarn itself, and which can be repeated from piecing point to piecing point on the same spinning unit and between different spinning units. [PX 273, Col. 1, L. 57–61]. To this end, according to the Patent, the invention is based upon the fact that the size of the piecing point can be precisely controlled only if it can be assured that the fiber beard offered to the opener roller at the beginning of the sliver feed for forming the fiber ring for piecing up is always identical. This assures that no uncontrolled or unknown quantity of fibers are allowed to find their way into the rotor groove and become a part of the fiber ring used to form the piecing point. [PX 273, Col. 2, L. 9–13]. Thus, according to the Patent, before beginning the sliver feed for forming the ring of fibers in the rotor for the actual piecing operation, a precisely controlled sliver prefeed is initiated in such a way as to eliminate from the system (e.g., as by suction) the combed out sliver beard consisting of an unknown quantity of fibers and replace it with a new fiber beard consisting of a known quantity of fibers. [Tr. 69–71; 208–210; PX 273, Col. 4, L. 18–25].

39. This precisely controlled sliver pre-feed is shown in a graph drawn by Fritz Stahlecker during his testimony at trial, which is Plaintiffs' Exhibit 326 and is reproduced here in reduced form.

The portion to the left of the vertical line GB shows the sliver being prefed so that the fibers of the unknown fiber tuft are combed and eliminated to waste via vacuum while being prevented from being captured in the rotor, and thus from becoming part of the fiber ring for piecing. [Tr. 57].

40. Once this elimination of the unknown fiber beard is completed, represented by line GB itself, any point along the portion to the right of the line GB then represents a known, uniform fiber tuft and can be utilized in forming the ring for piecing, so long as such point is selected consistently in a known fashion each time piecing occurs. It does not matter whether such point is on the flat portion of the curve, while the sliver feed is still running, or on the exponential decay portion of the curve, while the fiber beard is being combed out in a known way, or after the sliver is restarted, if indeed it is first stopped and then restarted. One point is as good as another. [Tr. 57–58].

41. The portion to the left of the point labeled "O FST" in Plaintiffs' Exhibit 326 is the same as that shown on Figure 2 of the '946 Patent to the left of the ordinate. The portion to the right of the point "O FST" is essentially like that shown to the right of the ordinate in Figure 2, and has to do with the situation where it is desired to piece up when the rotor is at less than full operational speed, and the sliver feed runup must be correlated with the rotor speed runup. [Tr. 58–59]. Figure 2 of the '946 Patent, *infra* at 852.

42. As such, this portion to the right of the ordinate in Figure 2 of the '946 Patent and to the right of the point "O FST" in Plaintiffs' Exhibit 326 represents the subject matter of Plaintiffs' prior '610 Patent. [PX 155A]. This subject matter may optionally be utilized in combination with the controlled prefeed of the '946 Patent in suit, but does not have to be so utilized. [Tr. 71–72, 99–102].

43. The foregoing would be understood by any person of ordinary skill in the art studying Figure 2 of the '946 in conjunction with the specification thereof, and such

overall understanding is not negated or diminished by the fact that the preferred embodiment disclosed in the '946 Patent happens to select a point on the exponentially decaying portion of the curve shown hereinabove as well as to the left of the ordinate in Figure 2 of the '946 Patent. That is, such preferred embodiment actually acts to start, run and stop the sliver feed to renew and establish a fiber beard of known and controlled quantity, and thereafter restart that feed for piecing, all in controlled fashion. [Tr. 57–59].

44. The '946 invention was unveiled to the public in October 1975 with the introduction by Suessen at the ITMA Exhibition in Milan, Italy, of its then latest prototype version of its "SpinCat" and "CleanCat" automated piecing and rotor cleaning devices, and was enthusiastically received and highly acclaimed. [Tr. 62–63; 158].

45. The big bone of contention in this whole matter is whether the Defendant's machine, the NFRS, infringes on Claim 18 of the Plaintiff's '946 Patent [PX 273] under the doctrine of equivalents.[1] That claim reads as follows:

18. Apparatus according to claim 17.

(a) 17. Apparatus for thread piecing in an open-end *spinning assembly* comprising:

(b) opening means for opening sliver being supplied to a spinning rotor of said spinning assembly,

(c) feeding means for feeding sliver to said fiber opening means,

(d) piecing means including means for introducing a thread end back into said spinning rotor to be pieced together with a fiber ring formed in said spinning rotor,

(e) rotor control means for moving said spinning rotor from a stop condition toward an operating spinning speed to accommodate piecing by said piecing means,

(f) and fiber supply preparing means for (1) *preparing said spinning assembly for a piecing operation prior*

to movement of said spinning rotor from its stopped position, said fiber supply preparing means including means for (2) *starting and operating said feeding means for a period of time and then stopping said feeding means,* said starting and stopping being accompanied by a continuously operating opening means, whereby (3) *uniform* (4) *fiber tufts* are arranged at said sliver feeding means to accommodate said piecing operating to be subsequently performed.

(g) further comprising

(5) means for *supplying a vacuum to said spinning rotor* to remove any fiber supplied *during said preparation* of said spinning assembly by said preparing means.

46. This claim is illustrated by Fig. 2 of the '946 Patent on page 852, *infra.*

47. The Plaintiff's patent is titled "Method and Apparatus for start-spinning a thread on open-end spinning units."

48. The crucial paragraph to be construed is paragraph (f) of claim 17, which is incorporated into claim 18.

49. Paragraph (f) provides for a fiber supply preparing means in order to prepare the spinning assembly for a piecing operation *prior* to the movement of the spinning rotor from its stopped position.

50. Thus, the first *limitation* is the preparation of the spinning assembly *prior* to the movement of the spinning rotor from its stopped position. That is accomplished by the second *limitation* which is the starting and operating of the feeding means for a period of time, followed by stopping the feeding means, where the starting and stopping are accompanied by a continuously operating opening means (i.e., the comber roll continues to operate and comb out fibers from the end of the sliver which has been stopped for a known period of time), so that a uniform fiber tuft is arranged at said sliver feeding means to

---

1. For convenience of reference, Claim 18 has been divided into paragraphs designated by letters as indicated.

accommodate performing the piecing operation.

51. Claim 18 provides for supplying a vacuum to the spinning rotor to remove any fiber supplied during the preparation of the spinning assembly by said preparing means.

52. The '946 Patent [PX 273] in Col. 1, L. 6–55 reviews different methods which have been used to try to accomplish start spinning points which are uniform in appearance and strength in repeat start spinning on the same spinning unit and between different spinning units, in the event of a thread break.

53. The '946 Patent then continues in Col. 1, L. 57 through 62:

It is the object of the present invention to permit even more precise control of the sliver feed than previously, so that the quantity of the fibers fed during the start spinning operation can be matched to the start spinning speed even more precisely than had previously been the case.

54. The '946 Patent continues in Col. 1, L. 63–68 and Col. 2, L. 1–31, as follows:

According to the present invention, this object is solved by a method for start-spinning a thread on open-end spinning units, in which an end of the thread is returned to a spinning rotor running in an under-pressure chamber, placed on a ring of fibers formed from individual fibers separated from a fed sliver and deposited in the spinning rotor, and then drawn off again, whereby in order to form a ring of fibers which is suitable for the start-spinning operation the feed of the sliver is switched on for a given period of time prior to the end of the thread being placed on the ring of fibers and the thread being drawn off again, the feed then being interrupted again and finally only switched on again for the actual start-spinning operation.

The present invention is based upon the realization that the sliver feed can only actually be precisely controlled if it can be assumed that the fiber tuft offered to the opener roller at the beginning of the sliver feed prior to the start-spinning operation is always the same. This was not always so in many cases. Tests have shown that the nature of the fiber tuft is greatly dependent upon the standstill period following which the sliver feed is started again. If a second start-spinning operation with controlled feed of the sliver is performed after a very brief standstill period, for example after an unsuccessful start-spinning attempt, the fiber tuft will be significantly thicker than would be the case after a long standstill period, after which the fiber tuft would have been heavily combed and become correspondingly thin. Consequently, in spite of precisely maintained uniform sliver-feed starting conditions, different quantities will be fed. According to the present invention, this possibility is eliminated in that prior to every start-spinning operation a precisely defined fiber tuft, which always recurs in the same shape, is produced by briefly switching on the sliver feed; the fiber tuft then permits precise control of the quantity of fibers fed.

55. Thus, the essence of the '946 Patent is the formation of a uniform fiber tuft for each piecing operation; that is, control over the quantity of fibers in the ring of fibers in the spinning rotor at the time the piecing point is formed.

Under Claim 18 this is accomplished by ... including means for starting and operating said feeding means for a period of time and then stopping said feeding means, said starting and stopping being accompanied by a continuously operating opening means, whereby uniform fiber tufts are arranged at said sliver feeding means to accommodate said piecing operation to be subsequently performed ... further comprising means for supplying a vacuum to said spinning rotor to remove any fiber supplied during said preparation of said spinning assembly by said preparing means. [Claims 17 and 18 Col. 9, L. 61–68; Col. 10, L. 1–4].

In order to provide proper control of the quantity of fibers being fed, the present invention stipulates that before the actual start-spinning operation and the sliver

feed occurring in the connection therewith, there is a sliver feed operation at time Tu which is then switched off again at time Tv, thereby providing a precisely defined standstill period for the sliver feed, causing the same remainder Qr to be provided in all cases, so that precise control of the start-spinning quantity Q'a is then achieved on the basis of this remainder Qr and start-spinning quantity Q'a is the same in all cases. In this connection, it is practical for the sliver-feed switch-on time, which increases in accordance with dash-dotted curve 5a, to be maintained for a certain period of time, during which operating feed Qb is provided with certainty, as the influence of a remainder could otherwise still be disturbingly noticed with this brief sliver feed, the so-called preliminary feed. *Since the spinning rotor is braked or stopped during the preliminary sliver feed operation, the fibers supplied to it are sucked away by means of an underpressure line, thereby preventing them from being deposited in the spinning rotor.* The ring of fibers on which the return end of the thread is placed is thus formed only by the fibers supplied in the controlled sliver feed operation. [Col. 4, L. 1–25] (emphasis added).

Fig. 2

### The OFRS

56. The Defendants' version of how the OFRS worked is on Page 95 of their Post Trial Findings of Fact and Conclusions of Law as follows:

Savio developed an OES machine and identified the machine as the FRS. The Savio FRS machine included a number of spinning units serviced by a travelling carriage for piecing as well as other automatic functions. [Ferro Tr. 699–700]. The automatic piecing system of the travelling carriage for the FRS machine followed the steps utilized for piecing on the BD–200 machine; a preparatory cycle including sliver prefeeding, and a start-spinning cycle including piecing. [Ferro Tr. 699–700].

In the old FRS prefeed system, as in the BD–200 prefeed system, upon detecting a thread break, the feeding stops. When the piecing unit (or operation) arrives, the feeding means are started, operated and then stopped to perform a preliminary feed (prefeed), the spinning unit is opened, and the rotor is discon-

nected from its drive mechanism and stopped. After stopping, the rotor is cleaned. After the rotor is cleaned, the spinning unit is closed and the piecing operation starts. The time period between stopping the feed roller after the preliminary feed and starting the feed roller for piecing (i.e., for opening the spinning unit, cleaning the spinning unit, closing the spinning unit and starting the feed roller for piecing) varied from one yarn piecing to another. [DX 50(A); DX 51; Ferro Tr. 703–717] [Vaughn Tr. 595–97].

## FRS NORMAL SPINNING
### (ORIGINAL and MODIFIED)

**PLAINTIFF'S EXHIBIT**
313
ALL-STATE LEGAL SUPPLY CO.

57. The Plaintiffs contend that: Paragraph (b) of Claim 18 reads onto the comber roll in PX 313, the OFRS (combing roll and opening roll in PX 313 are the same.) [Tr. 262].

58. Paragraph (c) of Claim 18 reads onto the feed roller at the bottom left corner of PX 313.

59. Paragraph (d) of Claim 18 reads onto the yarn reserve lever and grippers of

the untwisting unit and the withdrawal tube of the rotor [Tr. 262–263].

Paragraph (e) of Claim 18, rotor control, reads onto the brake that stops the rotor, and the pivoting open of the spinbox cover which lifts the spindle of the rotor off its drivebelt and applies a brake to stop it. [Tr. 263–264]. The stopping and starting of the rotor, spinbox door opening, rotor cleaning with vacuums, sliver prefeed, and piecing feed, yarn end introduction, and withdrawal of thread are all diagrammed on PX 306. [Tr. 264].

Referring to PX 306, Plaintiffs contend that as in ¶ (f), Claim 18 hereinbefore set out there is an opening means which is the comber roll on PX 313, the old or original and modified or NFRS. [Plaintiff's PT Findings of Fact p. 36].

## ORIGINAL FRS

PLAINTIFF'S
EXHIBIT
306
ALL-STATE LEGAL SUPPLY CO.

60. Paragraph (f) of the '946 Patent, the fiber supply preparing means, is demonstrated on PX 306. That is, there is a prefeed of sliver, the rotor is then stopped by opening the spinbox door and is then cleaned by a vacuum. The rotor is started, there is a piecing feed of sliver, the yarn is introduced to the ring of fibers, piecing occurs and the thread is withdrawn. Meantime, although the comber roll is disengaged, it continues to rotate by inertia until the rotor box is closed and the drive is reengaged. [Tr. 263–267].

61. At the end of the prefeed in the OFRS the unknown fiber tuft is eliminated and a new fiber tuft is formed and time controlled until used. [Tr. 320].

62. There is precise control between the end of the prefeed in the OFRS and the beginning of the piecing feed, or at least the capability of precise control. [Tr. 320].

63. The Defendants' experts Vaughn and Ferro testified on direct examination that the restarting time of the sliver feed for piecing varied considerably, that the time period between the end of the sliver feed for the preliminary feed and the beginning of the sliver feed for piecing varied by about 2–3 seconds from piecing to piecing. [Tr. 589–592; 707–710].

64. Apparently this variation occurs because the rotor box is opened automatically by pneumatic systems and those systems are somewhat inconsistent in terms of the time they carry out that function [Tr. 591]. The Defendants contend that because of this and the result that there is not a

uniform fiber tuft there is no infringement. [Tr. 590–593; 645–646; 707–709].

65. The Plaintiffs' expert Bartlett testified that he caused a continuous time sequence to be placed on a videotape of the OFRS machine [PX 418] and found that the time between the end of prefeed to the beginning of piecing feed was an average of 16.75 seconds with a variance of only 0.2 seconds, and the average time from door opening to door closing was 8.35 seconds with a variation of .05 seconds. [Tr. 981–982].

66. Even more important however, as the Plaintiffs' expert Bartlett testified, adjustments can be made to the OFRS machine on piecing so that uniform fiber tufts could be obtained. [Tr. 982–985].

67. On the OFRS adjustments could be made to make the piecing point thinner or thicker by adjusting the amount of fibers in the ring. [Tr. 763–764].

68. Thus, it appears to the Court that Claim 18 of the '946 Patent reads literally and directly on the OFRS. That claim provides:

(a) a preparatory cycle including sliver prefeeding [Tr. 701–702];

(b) a combing or opening roller which functions to open sliver being supplied to the spinning rotor [PX 313; Tr. 261];

(c) a sliver feed roller to feed the sliver to the opener roll [PX 313];

(d) a means for introducing a thread end back into the spinning rotor to be pieced together with a fiber ring formed in the spinning rotor. [Tr. 262];

(e) means for moving the spinning rotor from a stopped to an operating spinning speed to accommodate piecing by said piecing means. [Tr. 264];

(f) a fiber supply preparing means for

(1) preparing said spinning assembly. for a piecing operation prior to movement of said spinning rotor from its stopped position for a piecing operation. [Tr. 263–264; PX 306].

(2) the fiber supply preparing means included means for starting and operating said feeding means for a period of time and then stopping said feeding means, said starting and stopping being accompanied by a continuously operating opening means. [Tr. 263–266; PX 306].

(3) The timewise coordinates of the functions of these elements arranges uniform tufts at the sliver feed roll to accommodate the piecing operation to be subsequently performed. [Tr. 266–268];

(g) a means for supplying a vacuum to said spinning rotor to remove any fiber supplied during said preparation of said spinning assembly by said preparing means. [Tr. 268–269; PX 306].

69. Mr. Ferro, Defendants' expert witness testified on direct examination as follows:

Q. Turning your attention to the FRS machine, would you generally describe the piecing operation in the event of a yarn break?

A. Yes. The FRS machine was meant to be operating with the traveling carriage and when a spinning unit required the operation of the automation carriage, this unit would communicate to the carriage to stop. The carriage would stop and receive the information on the type of cycle required and consequently would do its operation.

For example, in case of a piecing cycle, the first operation carried out by the carriage was to activate the sliver feed for a period of time which was sufficient to eliminate the damaged fibers which were present on the end of the sliver. After this first phase, the feeding would be stopped and the carriage opened the spinning unit.

Once the spinning unit was completely opened, the rotor would disengage from its drive belt and it was braked. After that an automation arm would move inside the unit that was open at this time in order to clean the rotor.

After having cleaned the rotor, the arm would return to its position, the unit would be closed again. At the same time other automatic functions were looking for the yarn end on the package. At this

point, the yarn end was prepared for the piecing, introduced in the discharge tube of the spinning unit. At this point, feeding will start again. The yarn would be released inside the rotor in order to come into contact with the fibers and it would be re-extracted by utilizing the pressure roller of the machine.

[Tr. 701–02].

*The NFRS System*

70. The NFRS fiber deflection system is also directed to a method and apparatus for effecting piecing of a broken thread end but by introducing a full flow, that is, 100% combed fibers into a rotor operating at full yarn-producing speed at the time of piecing. The NFRS operates in principle by deflecting the flow of fibers (which normally enter the spinning rotor during yarn spinning) away from the spinning rotor operating at yarn-producing speed, and only returning the flow of fibers to the spinning rotor after the piecing operation is started. The full flow of fibers is redirected to the spinning rotor in timed relation to the introduction of the thread end into the rotor for piecing. [Tr. 720–28; 735–40; 590–600; DX 52B, 52A–1–3, 53 and 57].

71. Dr. Vaughn illustrated his testimony with DX 33 (*infra*) wherein the upper line represents the rotor and the lower line represents the fiber feed. He testified that at the instant of breakage on the NFRS machine, the rotor continues to operate and the fiber feed is stopped by activation of the yarn detector [Tr. 599–600]. The rotor is then stopped by the opening of the box. There is then a period in which both the rotor and the fiber feed are stopped. The rotor is started again and gets up to full operating speed. At that point, the fiber feed starts, deflecting away the fed fiber. The Plaintiffs contend this is a "pre-feed". Upon the rotor reaching 100% of its operating rate, and at the time it is necessary for the fibers to be in the spinning chamber groove, the fibers are redirected to the spinning groove and piecing occurs.

72. Dr. Vaughn continued to describe the contrast in piecing with the '946 Patent and DX 33. Dr. Vaughn indicated that when breakage occurs with the '946 apparatus, the rotor is stopped and the fiber feed is stopped. Further, during the period the rotor is stopped, there is a fiber feed [See 5A on DX 33] and that feed is stopped and continues to be combed by the comber roll [See 5B on DX 33]. [See '946 Patent; PX 273; Fig. 2]. The rotor is then started, the fiber feed is started again, and piecing occurs where the lines representing the rotor and the fiber-feed come together.

PIECING OPERATION
NEW FRS MACHINE

PIECING OPERATION
STAHLECKER 946

73. Mr. Ferro, Defendants' expert, testified further that the NFRS combines an open-end rotor spinning machine which includes a number of spinning units (e.g. 216) with a traveling carriage which serves the spinning units. The traveling carriage for the machine includes the fiber deflection system known as "TOP PIECER" which repairs yarn breaks. [Tr. 726–28 and 747–48; DX 52A–1 to 3].

74. To aid understanding of what next occurs, two illustrations are provided below. [Based upon Figures A and B of DX 57]. Figure A shows the NFRS fiber deflection system in operation during the yarn break (*i.e.*, the suction conduit of the "TOP PIECER" engages the spinning unit). Figure B shows the resumption of the normal yarn spinning process (i.e., the removal of the suction conduit of the "TOP PIECER" from the spinning unit).

FIG. A FIG. B

75. As illustrated in Figure A, upon detection of a thread break by the break detection lever, the feed roller (5) stops. When the traveling carriage of the FRS machine arrives, the spinning unit (1) is opened, the rotor (9) is disconnected from its drive mechanism, and is stopped. After stopping, the rotor is cleaned. After the rotor (9) is cleaned, the spinning unit (1) is closed (which starts the rotor) and the piecing operation can commence. During this entire time the feed roller (5) remains at rest while the end of the sliver (3) is progressively depleted and damaged by the comber roll (2) which continues to rotate. [DX 51, 52B, 53; Tr. 724–28 and 738–40]. Once the rotor (9) is started for the piecing operation of the NFRS, it is not disconnected from its drive mechanism nor is it stopped or slowed in any way [DX 53; Tr. 724–28 and 738–40]. As will be developed, the same is true for the feed roller (5). Once it is started, it is not stopped or slowed in any way. [DX 53].

76. After cleaning, the rotor (9) is started by closing the spinning unit (1) (cover of unit not shown). As the rotor (9) moves towards its full yarn production speed, the suction conduit (19) of the "TOP PIECER" moves from the traveling carriage (not shown) and engages the trash removal system (11, 17 and 18) of the unit (1). Next, a flap valve in the vacuum source of the "TOP PIECER" opens to create a suction flow through conduit for removal of damaged fibers from the spinning unit (1) (including from the comber roll 2 and the interspace 7) to remove the fibers damaged by the action of the continually rotating comber roll (2) upon the sliver (3) at the stopped feed roller (5). The feed roller (5) is then started, whereupon the sliver (3) is again fed into the unit (1). Once the feed roller (5) starts, it is not disconnected from its drive mechanism, nor stopped or slowed in any way. [Tr. 723; DX 53]. The comber roll (2) continues to comb the sliver into individual fibers and those fibers also are deflected away from the path (8) to the rotor and out of the spinning unit (1) "upstream" of the rotor (9), via the temporarily applied vacuum source (19). This vacuum conduit (19) is not part of the spinning unit (1) but rather of the "TOP PIECER" on the traveling carriage. The deflected

fibers never reach the vicinity of the rotor (9). During this time, the rotor (9) is operating at full yarn-producing speed. [Tr. 723–25; DX 52B; DX 57, pp. 11–12].

77. When the feed roller has reached full operating speed and the full (100%) flow of fibers is being deflected away from the vicinity of the rotor (9), the vacuum via the suction conduit (19) is shut off by the flap valve and the full flow of fibers is directed towards the rotor (9). At the same time, the vacuum conduit (19) is withdrawn from engagement with the unit (1) (Figure B). The full flow of fibers operating at full feed roller speed now enters the rotor (9) which is operating at full yarn-producing speed. By entering the rotor (9), a fiber ring for piecing is formed and, when the broken thread end is returned to the rotor, it meets with the fiber ring, and piecing occurs. [Tr. 723–29; DX 52B; DX 53; DX 57, 11–12]. Thereafter the yarn forming process resumes as shown in Figure B, p. 858.

78. The flap valve in the vacuum source serves to influence and shut off the vacuum and is activated in timed relation with the introduction of the thread end into the rotor. Specifically, the thread end to be pieced is held in a gripper above the thread withdrawal tube and when the thread is released this activates the flap valve. Thus, the thread end is drawn into the rotor, as is the full flow of fibers, by the underpressure created by the rotor. [Tr. 723–24; DX 53].

79. · After piecing, the yarn is withdrawn with the full flow of fibers being continuously fed into the rotor and onto the package as for "normal" yarn production.

*As to the Equivalence of the NFRS (The Accused Device) to the '946 Suessen Machine*

80. We start with the general proposition as stated in *Graver Tank & Mfg. Co. v. Linde Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950) that a patentee may invoke the doctrine of equivalents to proceed against the producer of a device if it performs substantially the same function in substantially the same way to obtain the same result. The *Graver* court stated:

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum. It does not require complete identity for every purpose and in every respect. In determining equivalents, things equal to the same thing may not be equal to each other and, by the same token, things for most purposes different may sometimes be equivalents. Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important fact is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was.

*Graver*, 339 U.S. at 609, 70 S.Ct. at 856.

81. The accused device and the '946 machine are both methods and Apparatuses for start-spinning a thread on open-end spinning units, and both obtain the same result: piecing of broken thread. Thus, the only question before the Court is whether the way the accused device performs the work is the same as the way the '946 Patent does it, or at least whether the way the NFRS does it is equivalent to the way the Suessen machine performs the work.

The NFRS machine works as follows: The NFRS performs an automated piecing procedure without incorporating a prefeed and does that in a task oriented sequence and prepares the spinning chamber or has the fibers prepared for the piecing operation by using a technique called "deflection." At the instant of breakage of the thread in the new FRS machine, the rotor continues to operate, the fiber feed is stopped by activation of the yarn detector, and then the rotor is stopped by the opening of the box. There is a period when the rotor is stopped and the fiber feed is stopped. Then the rotor is started again. It gets up to full operating speed, and after

that the fiber feed is started and deflected away. The rotor reaches 100 percent of its operating rate, and at the time that it is necessary for the fibers to be in the spinning chamber, in the spinning groove, the fibers are redirected to that spinning groove and the piecing event occurs. [Tr. 599–600; DX 33].

In contrast, in the '946 Patent, there is a breakage, the rotor is operating, the fiber feed is stopped and the rotor is stopped, during the period that the rotor is stopped, and while the rotor is in its stopped position, there is a feeding of fiber, and that feed is carried out for a period of time and then that feed is stopped again, and then afterwards the rotor is started and the feed is started again and then piecing occurs at a point thereafter. Figure 2 of the '946 Patent illustrates this. Looking at Figure 2 *supra*, p. 852, the preliminary feed operation begins at time TU. The preliminary feed operation is briefly stopped at point TV. The fiber beard remains known, and an exactly determined amount of fiber can be fed into the rotor. The process of feeding fibers starts at Line QB in Figure 2. The yarn draw off starts at point TA. The dotted line is the good line. The dotted line takes into consideration the mass of the known fiber beard. The solid line below the dotted line is identical with the preceding Patent 610 [Tr. 71; Figure 2 Patent; DX 27A; PX 273]. *See* Fig. 2 *supra* p. 852.

82. Both the '946 Patent and the NFRS have a method for cleaning the rotor while it is stopped. In the '946 Patent Claim 18, paragraph (g) provides:

(g) further comprising

(5) means for supplying a vacuum to said spinning rotor to remove any fiber supplied during said preparation of said spinning assembly by said preparing means.

83. Plaintiffs' witness Bartlett explained this vacuum when he said in essence that there is a part (8a) just below the rotor as shown in Figure 3 of the '946 Patent reproduced *infra*. *See* Bartlett Tr. 226–27. The part (8a) is a vacuum part that connects to a source of underpressure or supply of vacuum and is in the rotor chamber (8) shown in Figure 3. Thus, the rotor is subjected to a vacuum. The primary function of that vacuum is to lift and convey the opened individual fibers from the opening roll up the fiber supply tube into the rotor. That is the primary function of the vacuum, and the vacuum must be there when the rotor is spinning or spinning would not occur. The vacuum has a secondary function also depicted in Figure 3. That is, when the rotor is stopped, as there is then no centrifugal force to hold the fiber in the rotor groove, the vacuum will suck out any fiber making its way into the rotor and take it away. This secondary function further comprises the means for supplying a vacuum to the spinning rotor to remove any fiber supply during the preparation of the spinning assembly by the preparing means. Bartlett further testified that the preparation of the spinning assembly consisted of the sliver prefeed followed by a specific time for forming a uniform tuft. The fiber from the prefeed comes into the rotor but is sucked out because the rotor is stationary. The secondary function of the vacuum sucks away this fiber, (*i.e.*, the unknown quantity of fiber from the prefeed). In addition, any fiber that is combed over afterwards will be sucked away by this vacuum from the stationary rotor. It is this secondary function of the vacuum that Paragraph (g) of claim 18 reads onto. [Tr. 226–227].

## Fig. 3

FIG. 3.

84. In contrast to the above-described process, in the NFRS machine, when there is a thread break, a traveling unit arrives at the stopped spinning position. While the rotor continues operating at full operational speed, the cover of the spinbox is unlatched and opened. The rotor is then lifted off its drivebelt, a brake is applied to stop the rotor, and the rotor is then cleaned by a vacuum in the traveling unit. The cleaning head is then pulled away and the spinbox door closes. The rotor then starts and the auxiliary vacuum, or fiber suction vacuum, comes on while the rotor is accelerating to its operational speed. Then, before the auxiliary vacuum goes off, the sliver feed comes on, but because the auxiliary vacuum is operating, all fibers from the sliver feed are sucked out as waste through the vacuum snout [PX 314]. This diversion to waste continues until the fiber suction is switched off.

85. Bartlett prepared a chart [PX 308] reproduced *infra* to illustrate his testimony.

86. Looking at PX 308, Bartlett testified that the reason for the broken line on the sliver feed line, to the left of which is "prefeed," is that although the sliver feed is on, none of the fibers can be captured in the rotor. As explained above, this is because the fiber suction vacuum has rendered the rotor inoperative for spinning fibers. That is, fibers fed in the first part of the sliver feed, as the rotor accelerates to operating speed, are just taken to waste by the fiber suction vacuum. Then the auxiliary vacuum is switched off and the fibers can continue around to be captured by the rotor. The rotor is then operating at full speed, so captured fibers fed by the sliver feed go to the rotor and form a piecing ring and are then continually forming the fiber ring for spinning. The yarn end is introduced at a very precisely controlled time, and in a matter of thousandths of a second, the yarn is withdrawn. As the starter is withdrawn, the yarn is the making of the piecing point and it continues as spinning continues. [Tr. 258–282; PX 306, 308, 313, 314].

MODIFIED FRS

PLAINTIFF'S EXHIBIT 308

## CONCLUSIONS OF LAW

■ Under the doctrine of equivalents, infringement *may* be found (but not necessarily) if an accused device performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention. *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931 (Fed.Cir.1987) (citing *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 901–02 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984)); *Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856. That formulation, however, does not mean one can ignore claim limitations.

The Federal Circuit further held in *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532–33 (Fed.Cir. 1987):

In *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1364, 219 U.S.P.Q. 473, 482 (Fed.Cir.1983), this court noted that it was legal error not to "apply the doctrine of equivalents to the claimed invention as a whole." The statement dealt with an infringement inquiry implicating an entire claim, as distinguished from a section 112 ¶ 6 inquiry implicating only a "means plus function" limitation of a claim. That statement also was a recognition that, in applying the doctrine of equivalents, each limitation must be viewed in the context of the entire claim. The statement should not be interpreted as sanctioning the treatment of claim limitations as insignificant or immaterial in determining infringement. "It is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Lemelson v. United States*, 752 F.2d 1538, 1551, 224 U.S.P.Q. 524, 533 (Fed.Cir.1985). To be a "substantial equivalent," the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed. (Footnotes omitted).

■ Thus, in the case before the Court, the Plaintiffs have the burden to prove that

the accused device performed its work in substantially the same way as the apparatus in the '946 Patent. To do so, the Plaintiffs must prove that all limitations of claim 18 are satisfied at least equivalently by the accused device. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 798 (Fed.Cir.1990).

Further limitations to the doctrine of equivalents are set out in *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed.Cir. 1985):

> First, the doctrine will not extend to an infringing device within the public domain, *i.e.*, found in the prior art at the time the patent issued; second, prosecution history estoppel will not allow the patentee to recapture through equivalence certain coverage given up during prosecution. *See, e.g., Perkins–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 900, 221 U.S.P.Q. 669, 678 (Fed. Cir.1984), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

In further discussion of the prior art limitation to the doctrine of equivalents, the Federal Circuit in *Wilson Sporting Goods v. David Geoffrey & Assoc.*, 904 F.2d 677, 684 (Fed.Cir.1990) suggested:

> Whether prior art restricts the range of equivalents of what is literally claimed can be a difficult question to answer. To simplify analysis and bring the issue onto familiar turf, it may be helpful to conceptualize the limitation on the scope of equivalents by visualizing a hypothetical patent claim, sufficient in scope to literally cover the accused product. The pertinent question then becomes whether that hypothetical claim could have been allowed by the PTO [Patent and Trademark Office] over the prior art. If not, then it would be improper to permit the patentee to obtain that coverage in an infringement suit under the doctrine of equivalents. If the hypothetical claim could have been allowed, then prior art is not a bar to infringement under the doctrine of equivalents.

As to the second limitation, the doctrine of prosecution history estoppel, the Federal Circuit in *Builders Concrete, Inc. v. Brem-*

*erton Concrete Products Co.*, 757 F.2d 255, 258–59 (1985) stated:

> "Prosecution History (File Wrapper) Estoppel
>
> This doctrine is an equitable tool for determining the permissible scope of patent claims. As we said in *Caterpillar Tractor Co. v. Berco, S.p.A.*, 714 F.2d 1110, 1115, 219 U.S.P.Q. 185, 187 (Fed. Cir.1983), "[t]he interplay between the doctrines of equivalents and estoppel governs determination of infringement ... and is in turn governed by the prosecution history ...." Material representations made to the PTO in response to references cited by the PTO, with the result that the scope of patent claims is changed *in order to obtain the patent grant*, are pertinent to the subsequent determination of the permissible scope of the patent claims (emphasis added). As this court said in *Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1579, 220 U.S.P.Q. 1, 6 (Fed.Cir.1983):
>
> > [P]rosecution history estoppel, which precludes a patentee from obtaining a claim construction that would resurrect subject matter surrendered during prosecution of his patent application ... limits a patentee's reliance on the doctrine of equivalents ...

■ Thus, whenever the doctrine of prosecution history estoppel is invoked, a close examination must be made as to, not only what was surrendered, but also the reason for such a surrender. The fact that claims were narrowed does not always mean that the doctrine of prosecution history estoppel completely prohibits a patentee from recapturing some of what was originally claimed.

*Bayer Aktiengesellschaft v. Duphar Intern. Research*, 738 F.2d 1237, 1243 (Fed. Cir.1984).

As was stated by the court in *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576 at 1580 (Fed.Cir.1988):

> Resort to extrinsic evidence such as the prosecution history, is necessary to interpret disputed claims. *Moeller [v. Ionetics, Inc.]*, 794 F.2d [653] at 656, 229

U.S.P.Q. [992] at 994; *SSIH Equipment S.A. v. USITC*, 718 F.2d 365, 376, 218 U.S.P.Q. 678, 688 (Fed.Cir.1983) (the prosecution history is always relevant to proper claim interpretation). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452, 227 U.S.P.Q. 293, 296 (Fed.Cir.1985); *see also McGill, Inc. [v. John Zink Co.]*, 736 F.2d [666] at 673 (Fed.Cir.1984).

As the court said in *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.*, 743 F.2d 1581, 1583 (Fed.Cir.1984):

> While the doctrine of equivalents may sometimes be applied to amended claims,
>
> The doctrine of prosecution history estoppel precludes a patent owner from obtaining a claim construction that would resurrect subject matter surrendered during the prosecution of his patent application. [*Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351, 219 U.S.P.Q. 473, 481 (Fed.Cir.1983.)]

In *Weber Elec. Co. v. Freeman Elec. Co.*, 256 U.S. 668, 677, 678, 41 S.Ct. 600, 603, 603, 65 L.Ed. 1162 (1920) the court said:

> When his application was rejected by the Patent Office on reference to the Kenney patent thus described, the applicant, without objection or appeal, amended his claim seven (numbering it four) by adding the words in italics and in his explanatory "remarks," when submitting these amendments, it was said: "Claim 4, originally 7, is now *drawn to a specific structure* having advantages not found in either of the references cited. By transversely slitting the sheet metal shell and displacing the wall on one side of said slit to form a beveled or inclined projection the parts are permitted to be applied to each other *by simply inserting one within the other* without manually compressing the inner member." And again, "Kenney's device is adapted to *unlock by simply rotating one member upon another in the same manner that the parts are locked together,* no manual compression of the inner member being necessary."

Thus the patentee, in order to avoid infringing Kenney's construction, voluntarily restricted himself to a "specific structure" operative when the sleeve was "simply" inserted in the cap, without suggesting any rotary movement whatever, but, on the contrary, by his reference to Kenney as locking and unlocking by "simply rotating one member upon another," clearly implying that no such rotary movement was necessary in the adjustment of his socket. Having thus narrowed his claim against rotary movement in order to obtain a patent, the patentee may not by construction, or by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments, which amount to a disclaimer of rotation as an operative feature of his device. *Shepard v. Carrigan*, 116 U.S. 593, 598 [6 S.Ct. 493, 495, 29 L.Ed. 723]; *Hubbell v. United States*, 179 U.S. 77, 80 [21 S.Ct. 24, 25, 45 L.Ed. 95].

■■■ The claims of the '946 Patent measure Plaintiffs' invention. Plaintiffs' claims must be interpreted and given the same meaning for purposes of both validity and infringement. *SRI International v. Matsushita Elec. Corp. of America*, 775 F.2d 1107 at 1122 (Fed.Cir.1985). Claim construction, the threshold inquiry when resolving infringement, is a question of law, having factual underpinnings which include interpretation of disputed or ambiguous claim language based upon, *inter alia*, the claim in issue, the specification of the Patent in issue, the prosecution history of the Patent in issue, the prior art, other claims appearing in the Patent in issue, as well as how the claims would be construed by one skilled in the art. *Loctite*, 781 F.2d at 866–867; and *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1021 (Fed.Cir.1987). With this background, that is, under the doctrine of equivalents, we will consider the issue of alleged infringement by the NFRS fiber deflection system.

The Plaintiffs concede that the NFRS does not literally infringe the '946 apparatus in its "first attempt mode" because the "fiber supplying preparing means does not in its details correspond exactly to the details recited in the claim." However, the Plaintiffs do claim there is nevertheless infringement under the doctrine of equivalents because "... both that recitation and the claim as a whole find response in the NFRS machine ..." [Plaintiffs' Post Trial Brief and Conclusion of Laws, [hereinafter "Pl. PT Brief"], page 23.

*Issues*

The first issue is:

1. "Does the NFRS infringe on claim 18 of the '946 Patent under the doctrine of equivalents?"

The Plaintiffs next claim that claim 18 reads literally on the NFRS machine when operating in its "second attempt mode" in that "... each limitation recited in the claim finds direct correspondence in a portion of the accused machine which is structurally the same or equivalent and functions in the same way ..." [Pl.PT Brief p. 23].

Thus, the second issue is:

2. "Does the NFRS infringe literally or equivalently on the Suessen machine when operating in the second attempt mode?"

The Defendants claim that claim 18 of the '946 Patent is invalid over the prior art under 35 U.S.C. § 103 and pose the issue, which is the third issue:

3. "Is claim 18 of the '946 Patent invalid over the prior art under 35 U.S.C. § 103, particularly in view of Plaintiffs' attempt to broaden the interpretation of claim 18 to include 'Fiber Deflection Art,' the 'BD–200 Art' and the 'Repeat Art'?"

The Defendants next pose the issue which is the fourth issue:

4. "Is claim 18 of the '946 Patent invalid under 35 U.S.C. §§ 102(b) and 103 in view of the "on sale" activities of the Plaintiffs with respect to the subject matter of the '946 Patent in the U.S. more than one year prior to the filing

date of the '946 application in this country?"

The Defendants raise the issue, which is the fifth issue:

5. "Is claim 18 of the '946 Patent invalid because the Patent does not comply with the requirements of 35 U.S.C. § 112; in particular, that the inventors did not set forth the 'best mode' contemplated by them for carrying out the invention of claim 18 of the '946 Patent?"

The Defendants next raise the issue which is the sixth issue:

6. "Is the '946 Patent unenforceable because of inequitable conduct before the U.S. PTO during the prosecution of the application for the '946 Patent?"

The final issue, which is the seventh issue:

7. "Does the OFRS prefeed system infringe claim 18 of the '946 Patent literally?"

### 1. *Doctrine of Equivalents.*

■ We will turn now to the first issue: Does the NFRS infringe on claim 18 of the '946 Patent under the doctrine of equivalents?

The Plaintiffs, in their PT Brief, first refer to the rationale set forth in *Graver Tank*, behind the Doctrine of Equivalents. The Plaintiffs assert that in essence the doctrine of equivalents is meant to prevent accused infringers from "practicing a fraud on the Patent" by using the invention while not copying every literal detail. The Plaintiffs also contend that *Hughes Aircraft Co. v. U.S.*, 717 F.2d 1351, 1364 (Fed.Cir.1983) stands for the proposition that infringement under the doctrine of equivalents "... does *not* require complete identity for every purpose and in every respect, but can, for example, be based on "striking overall similarities."

A study of Defendants' argument contained in their PT Brief fails to disclose any language to the effect that the doctrine of equivalents requires complete identity for every purpose in every respect. However, the Defendants do contend that claim 18 of

the '946 Patent is written in a "means plus function" language and is subject to the provisions of 35 U.S.C. § 112, sixth paragraph, and that under the doctrine of equivalents infringement may be found if an accused device performs substantially the same way to obtain substantially the same result as the claimed invention. The Defendants contend further that in applying the doctrine, only if all the limitations are satisfied at least equivalently can it be found that the two devices work in substantially the same way [Defendants' PT Brief 34 and 36]. *Hughes Aircraft* is not apropos to the argument by the Defendants in this case. *Hughes Aircraft* was a case in which the trial judge, in not finding an equivalent infringement, had said:

> There is no *obvious or exact* equivalent of plaintiffs' means for providing an indication of the ISA to an external location ... nor is there an *obvious or exact* equivalent of the means for pulsing ... *Hughes*, 717 F.2d at 1363 (emphasis added).

In the finding of no equivalence in *Hughes*, the Federal Circuit stated:

> The failure to apply the doctrine of equivalents to the claimed invention as a whole, and the accompanying demand for "obvious and exact" equivalents of the two elements the presence of which would have effectively produced literal infringement was error.

*Id.* at 1364.

■ The Court has found no such contention that the Plaintiffs must show literal infringement on the part of the Defendants in this case. What the Defendants do argue is that the substantial similarity of function/way/result test must be applied in light of claims limitations. *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528 (Fed.Cir.1987). In a "means-plus-function" claim, each element of the claim is material and essential, and in order to find infringement under the doctrine of equivalents, the presence of every element or its substantial equivalent in the accused device must be shown, *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed.Cir.1985). Further, the doctrine of equivalents is ap-

plied on an element by element basis, known as the "all elements rule". If a single function is missing, or the means to perform an equivalent function is missing, there is no infringement. [Def.T.B. p. 35]. *See Pennwalt*, 833 F.2d at 935–39.

On page 29 of Plaintiffs' PT Brief, the following paragraph appears:

> As noted in Finding 80, defendants have offered no evidence to the effect that the plaintiffs' expression of the work/way/result for Claim 18 is incorrect or that the '946 Patent is not susceptible of supporting such an interpretation. In addition, the defendants' Patent expert, Mr. Platt, testified at trial that if plaintiffs' version of the '946 work/way/result is legally correct, then the modified FRS machine comes within that version and plaintiffs have met their burden of showing infringement of the modified FRS under the Doctrine of Equivalents. Thus, in essence, the defendants have admitted that the modified FRS machine is an "equivalent" of the invention of Claim 18. The defendants thus base their claim of noninfringement solely on their position that the range of equivalents asserted by plaintiffs is unduly broad by reason of the prior art and/or prosecution history estoppel.

That is not an entirely correct statement. The Court assumes that the Plaintiffs are referring to PX 332 which reads as follows:

### EQUIVALENCE OF MODIFIED FRS MACHINE IN RESPECT TO APPARATUS OF CLAIM 18

#### WORK

Piecing up a rotor spinning assembly which has been out of operation for an unknown length of time and has an aged fiber beard of unknown fiber quantity being combed by a continuously operating combing roll.

#### WAY

(i) Eliminating the aged fiber beard while preventing the unknown quantity of fibers therefrom from being captured in the rotor for piecing;

(ii) Producing in the rotor groove a fiber piecing ring of known fiber quantity; and

(iii) Then piecing with this known fiber piecing ring.

### RESULT

Production of consistently uniform piecing points of high quality.

The Defendants have offered ample evidence that Paragraphs (f) and (g) of Claim 18 of the '946 Patent refer to the preparation of the spinning assembly for a piecing operation *prior* to the movement of the spinning rotor from its stopped position. That is:

(f) and fiber supply preparing means for (1) *preparing said spinning assembly for a piecing operation prior to movement of said spinning rotor from its stopped position,* said fiber supply preparing means including means for (2) *starting and operating said feeding means for a period of time and then stopping said feeding means,* said starting and stopping being accompanied by a continuously operating opening means, whereby (3) *uniform* (4) *fiber tufts* are arranged at said sliver feeding means to accommodate said piecing operation to be subsequently performed.

(g) further comprising

(5) means for *supplying a vacuum to said spinning rotor* to remove any fiber supplied *during said preparation* of said spinning assembly by said preparing means.

*See* Findings of Fact 45 *supra,* page 850.

Further, and contrary to the statement in Plaintiffs' PT Findings of Fact No. 80, Mr. Platt did *not* testify that the NFRS machine does in fact perform the same work in the same way to reach the same result. What Mr. Platt did testify to on cross-examination with reference to PX 332 is set out in Tr. 881–883 as follows:

Q. Mr. Platt, I asked you if they're inaccurate with respect to describing the FRS machine. That's all I asked you.

MR. HOARE: Your Honor, I OBJECT on the grounds that this chart starts with equivalence of modified FRS in respect to apparatus of Claim 18. I think the witness should be allowed to express his views when Claim 18 is captured right in the title of the document.

THE COURT: Let him answer the question asked first and then you can go into something else on redirect if you want to. Go ahead.

A. My answer to that is one can always think of a broad statement of a way which can take within its ambit almost anything. I just simply disagree with that statement. I think it's too broad. I think it doesn't accurately reflect the intention as set forth in Claim 18.

Q. That wasn't my question, Mr. Platt. My question was does it accurately describe the way in which the work is performed in the FRS machine?

A. My answer to that is no.

Q. Why?

A. Because to me way is one of the defined three-part—three parts of the Doctrine of Equivalence, and it's a judicially created doctrine. It must be interpreted under the correct judicial precedence [sic]. So just by putting the word way there, it carries with it a legal implication that is the correct way. I cannot agree with that.

Q. Well, Mr. Platt, I'm sure I'll never get you to agree with me on the law, but I'm trying to get you to agree with me on the facts now or point out where I'm wrong on the facts, and I'll give you one more chance to tell me what is inaccurate about those statements about the way there in Exhibit 332 for performing the work, which you've already said is performed on the FRS machine.

A. With the caveat that I've already stated and again saying that the language is much too broad to be encompassed in the Doctrine of Equivalence [sic] as applied to Claim 18, that statement describes something that is done in that machine.

Q. I see. But that caveat is a matter for the Court to decide, isn't it?

A. No, I think the Court must, as the tryer [sic] of the facts, must also deter-

mine whether that is the correct way to be applied in the light of all the factors that I've mentioned, including the patent itself and the prosecution history.

Q. All right. Let's look down at the results. Does that result accurately reflect the result on the FRS, new FRS machine?

A. I think it does, and I'd like to further elaborate on that answer. As I said during my direct testimony, many machines do the same work and accomplish the same results. That's why they're competitive machines, or at least substantially the same work and accomplish substantially the same results.

Two companies wouldn't be in competition with each other otherwise, and we wouldn't even be in court otherwise. The critical thing to my way of thinking is the way, and the way listed there, in my opinion, is completely unfounded and misleading because it's too broad.

Clearly, witness Platt did not testify at trial that if the Plaintiffs' version of the '946 work/way/result is legally correct, then the modified version comes within that version. What he said was that the Plaintiffs' Exhibit 332 was too broad a statement. The Court agrees.

To put it as succinctly as possible, the claims of a patent provide the concise formal definition of the invention, *see Autogiro Co. of America v. United States*, 384 F.2d 391, 395–96 (1967). The claims are the numbered paragraphs which "particularly point out and distinctly claim the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. It is to these wordings that one must look to determine whether there has been infringement.

The Plaintiffs, in their PT Brief, cite *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251 (Fed.Cir.1989). That case explains "these wordings" of a claim as follows:

"These wordings" of a claim describe and point out the invention by a series of limiting words or phrases (limitations). In the determination of infringement, the words of the claim must first be interpreted, *id.* at 396, 155 U.S.P.Q. at 705,

and, as properly interpreted, they must be "read on" the accused structure to determine whether each of the limitations recited in the claim is present in the accused structure. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 758, 221 U.S.P.Q. 473, 477 (Fed.Cir.1984). However, to hold a patentee to the precise claim language in all cases could turn "the patent grant into a hollow and useless thing." *Graver Tank*, 339 U.S. at 607, 70 S.Ct. at 855. As explained in *Graver Tank*:

"To temper unsparing logic and prevent an infringer from stealing the benefit of an invention" a patentee may invoke this doctrine [of equivalents] to proceed against the producer of a device "if it performs substantially the same function in substantially the same way to obtain the same result." *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42 [50 S.Ct. 9, 13, 74 L.Ed. 147]. The theory on which it is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape."

*Corning Glass*, 868 F.2d at 1258 (citation omitted).

■ The repeated assertions by the Plaintiffs that the Defendants' machine does the same work in the same way to obtain the same result just simply does not help in the determination of whether there is infringement of the Plaintiffs' '946 Patent by the Defendants' machine. That a claimed invention and an accused device may perform substantially the same function and may achieve substantially the same result will not make the accused device an infringement under the doctrine of equivalents where it performs the function and achieves the same result in a substantially different way. *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1531, n. 6 (Fed.Cir.1987).

The *Perkin–Elmer* court further held that:

... Though the doctrine of equivalents is designed to do equity, and to relieve an inventor from a semantic strait jacket when equity requires, it is not designed to permit wholesale redrafting of a claim to cover nonequivalent devices, *i.e.*, to permit a claim expansion that would encompass more than an insubstantial change.

*Perkin–Elmer*, 822 F.2d at 1532 (citations omitted).

The Plaintiffs in their PT Brief contend they have proved infringement of the '946 Patent by the Defendants' NFRS machine under the Doctrine of Equivalents applied both to the claimed invention as a whole and with respect to each limitation in the claim.

On page 45 of the Plaintiffs Post Trial Findings of Fact the Plaintiffs contend:

The *work* performed by both the modified FRS and the apparatus of the '946 Patent is the piecing up of a rotor spinning assembly which has been out of operation for an unknown length of time and has an aged fiber beard of unknown fiber quantity being combed by a continuously operating combing roll. The way this work is performed by both is (i) eliminating the aged fiber beard while preventing the unknown quantity of fibers therefrom from being captured in the rotor for piecing; (ii) producing in the rotor groove a fiber piecing ring of a known fiber quantity; and (iii) then piecing with this known fiber piecing ring. The result achieved by both is the production of consistently uniform piecing points of high quality. [Tr. 292–295; PX 273; PX 274; PX 332].

The Plaintiffs have failed to track the language of Claim 18 in describing the way the work is performed by the '946 Patent apparatus as described in paragraphs (f) and (g) of Claim 18.

There it is noted ¶¶ (f) and (g) provide:

(f) and fiber supply preparing means for (1) *preparing said spinning assembly for a piecing operation prior to movement of said spinning rotor from its stopped position,* said fiber supply preparing means including means for (2) *starting and operating said feeding means for a period of time and then stopping said feeding means,* said starting and stopping being accompanied by a continuously operating opening means, whereby (3) *uniform* (4) *fiber tufts* are arranged at said sliver feeding means to accommodate said piecing operating to be subsequently performed.

(g) further comprising

(5) means for *supplying a vacuum to said spinning rotor* to remove any fiber supplied *during said preparation* of said spinning assembly by said preparing means. (Emphasis added).

*See* Finding of Fact 45, *supra* page 850 (emphasis added).

Looking now at Figure 2 of the '946 Patent, *supra*, p. 852, which is the same as PX 302, we see that the vertical line delineates between what was added by the '946 Patent, with everything to the right of the vertical line being in the prior art and what was added by the '946 Patent being to the left of the vertical line. Point TU is the starting point of the feeding means for the prefeed, with the curve 5a representing the prefeeding until it reaches the horizontal line where it is operated for a period of time to vertical line TV where it is stopped. That is limitation (2) in paragraph (f). When the fiber supply prefeed is stopped, it is affected by the continuously operating combing roll, which causes a decay in the fiber tuft shown by line 5b to Qr where we have limitation (3) a uniform; and then limitation (4) fiber tuft.

Paragraph (g) then provides for the means for supplying a vacuum to the spinning rotor to remove any fiber supplied during the preparation of the spinning assembly by the preparing means. This is referred to in Col. 4, L. 18–22 of the '946 Patent [PX 273] which states:

Since the spinning rotor is braked or stopped during the preliminary sliver feed operations, the fibers supplied to it are sucked away by means of an underpressure line, thereby preventing them from being deposited in the spinning rotor.

Thus, in the '946 system it is obvious that the sliver prefeed system cannot be operated while the rotor is rotating, because the quite substantial centrifugal force of the rotor would overcome the force of the underpressure line and thus any prefed fibers would go into the rotor.

In contrast to the '946 machine, the NFRS introduces a full flow of combed fibers into the rotor running at full yarn producing speed at the time of piecing, utilizing the concept of deflecting fibers away from the spinning rotor operating at yarn producing speed until after the piecing operation is started. That is, the full flow of combed fibers is redirected to the spinning rotor in timed relation to the introduction of the thread into the rotor for piecing.

The Plaintiffs proffer as their Finding of Fact No. 79 that this process is the full equivalent of the '946 machine prefeeding before the rotor is started. The Plaintiffs further proffer that the rediversion of the fibers when the rotor is running is the full equivalent of executing the prefeed under time controlled conditions by starting and then stopping the sliver feed mechanism before starting the rotor and where the fed fibers are diverted to waste by other existing suction forces. The Court does not agree.

In summary, to find infringement, and in broad terms, the accused device must perform the same work in the same way and obtain the same result.

Assuming the premise is that the accused device does the same work as the Plaintiffs' machine (i.e., piecing up a rotor spinning assembly which has been out of operation for an unknown length of time), and has the same result, (i.e., production of consistently uniform piecing points), the question is whether the work is accomplished the same way.

The Plaintiffs contend that the NFRS performs the work in substantially the same way as the '946 apparatus, stating:

The way this work is performed by both is (i) eliminating the aged fiber beard while preventing the unknown quantity of fibers therefrom from being captured

in the rotor for piecing; (ii) producing in the rotor groove a fiber piecing ring of a known fiber quantity; and (iii) then piecing with this known fiber piecing ring.

Moreover, the "fiber supply preparing means" in the modified FRS for preparing the spinning assembly for piecing with a fiber ring consisting of a controlled quantity of fibers therein is the full equivalent of the "fiber supply preparing means" as called for in Claim 18 in that these particular means in the modified FRS also perform the same work, in substantially the same way, to produce the same result. In this regard, *prefeeding* after the rotor is started under time controlled conditions whereby the prefed fibers are incapable of being captured in the rotating rotor due to the presence of a suction force applied upstream of the rotor to divert the prefed fibers to waste before reaching the rotor is the *full equivalent of prefeeding* before the rotor is started under time controlled conditions whereby the prefed fibers will not be captured in the rotor because it is stopped, but rather, will pass by the rotor and be exhausted by the normal vacuum in the spinbox. Likewise, executing the prefeed under time controlled conditions by starting the sliver feed mechanism, diverting the fed fibers by a diversion vacuum to waste, and thereafter stopping this diversion vacuum to thereby cause the fiber flow to be rediverted to its normal path is the *full equivalent* of executing the prefeed under time controlled conditions by starting and then stopping the sliver feed mechanism before starting the rotor whereby the fed fibers are diverted to waste by other existing suction forces.

Plaintiffs' PT Findings of Fact at 45–46.

This Court has concluded that the work is not accomplished the same way because under Claim 18 of the '946 Patent the spinning assembly is prepared for a piecing operation prior to the movement of the spinning rotor from its stopped position, the feeding means is started and operated for a period of time, and then stopped, the starting and stopping being accompanied

by a continuously operating opening means, whereby uniform fiber tufts are arranged at the sliver feeding means to accommodate the piecing operation to be subsequently performed. The stopped sliver feed is affected by the continuously operating combing roll, which is acting on the stopped fiber tuft at Tu as shown in Fig. 2 of the '946 Patent, and the action causes decay in the fiber tuft and there is a downward slope of line 5b to Qr at which point the uniform fiber tuft is arranged for the subsequent piecing operating. The '946 Patent in Col. 4, L. 10–11 provides that the start spinning quantity Qa is the same in all cases because its time controlled step is the same each and every time leading to the precise fiber tuft. The precise uniform fiber tuft is positioned, ready for the subsequent piecing upon the restart of the piecing means. The restart of the feeding means occurs on the upward slope of the line 3', and the restart of the piecing can occur at any point on that line.

The '946 Patent performs the same work as the NFRS machine, but in a different way. Thus, the NFRS does not infringe on Claim 18 of the '946 Patent under the doctrine of equivalents.

### Prosecution History Estoppel

Under the Doctrine of Prosecution History Estoppel a patentee cannot claim under the Doctrine of Equivalents a range of equivalents broad enough to encompass subject matter surrendered during prosecution of the patent application. The estoppel applies to claim amendments to overcome rejections based on prior art. *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1362–63. The applicant's arguments which accompany the amendments may also be considered. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870–71 (Fed. Cir.1985). Amendments to overcome an examiner's rejection or one not critical do not result in the doctrine of estoppel being applied. *Datascope Corp. v. SMEC*, 776 F.2d 320, 325 (Fed.Cir.1985).

In order to determine whether any estoppel arises it is necessary to examine the reasons for the surrender. *Hi–Life*

*Products, Inc. v. American National Water–Mattress Corp.*, 842 F.2d 323, 325 (Fed. Cir.1988) (citations omitted). Likewise, the examiner's reasons for allowance must be considered and given weight. *Cf., Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed.Cir.1985).

The prosecution history of the '946 Patent reveals that the application which became the '946 Patent was filed with nine claims. There were method claims 1–2 and apparatus claims 3–9. [DX 27C, pp. 17–19; Tr. 810]. The Patent Examiner rejected claims 1–4 and 8–9, pursuant to 35 U.S.C. § 103, as being drawn to subject matter which was obvious in view of the prior art. Claims 5–7 were objected to by the Examiner as depending on rejected claims, but were indicated as otherwise allowable. [DX 27C, Rejection, dated August 9, 1976].

In rejecting claims 1 and 2, the Patent Examiner stated:

"A" (reference A is Landwehrkamp et al., United States Patent No. 3,791,128) discloses a method of start-spinning including the steps starting the feed of fibers to a low speed operated spinning unit, feeding the tail of yarn into the unit, terminating the low speed operation and starting the high speed operation of the feed means, spinning unit and take-off unit. In order to start the high speed operation of feed and spin, the low speed operation must obviously be terminated. [DX 27C, Rejection, dated August 9, 1976; Tr. 811–815].

In rejecting claims 3–4 and 8–9, the Patent Examiner stated:

"A" Applied as above. It would not require patentable invention and it would be obvious to have the actuating means for the low speed and high speed elements of the start-spinning device of "A" mounted on a traveling unit as it is old to use a travelling unit for the start-spinning and is shown in B. (Reference "B" is Miyazaki et al, United States Patent No. 3,810,352). [DX 27C, Rejection, dated August 9, 1976; Tr. 813–814].

In response to the rejection the Plaintiffs argued:

Following is a comparison with the Landwehrkamp arrangement [prior art], including a specific discussion of the claim language in these claims 1 and 2, *as well as in all other claims remaining in the application,* which limitations are submitted as patentably distinguishing over Landwehrkamp.

\* \* \* \* \* \*

The present invention relates to an *improvement ... whereby the initial starting condition of the sliver feed* is made to be uniform for all piecing operations. As pointed out in the specification of the present application in great detail, the *present invention is particularly directed to overcoming the disadvantages* due to different time delays between a thread breakage and the initiation of a piecing sequence, which *disadvantages resulted from the different amounts of combing out of the sliver* to be supplied, by way of the opening means. To *overcome these disadvantages, the present invention provides for a preparatory process* and apparatus *whereby the sliver feeding* means *is started* up and *operated, then stopped and* then, upon commencement of the run-up of the spinning rotor for the piecing operation, the feeding supply is *again started and operated. The preparatory steps* provide for uniformity of piecing operations and *remove the yarn irregularities caused by different qualities of tufts being initially supplied* to form the fiber ring during piecing operations with prior art arrangements. (Emphasis added) [DX 27C, Amendment, pp. 9–10; Tr. 816–20].

The Plaintiffs then filed an Amendment [DX 27C, "Amendment dated December 16, 1976], which canceled claims 3 and 4, rewrote claims 5 and 6 in an independent but otherwise unchanged form, which became claims 3 and 4 respectively and added claims 10–29. [Tr. 815–16].

Added application claims 10–29 which became patent claims 6–25, with claim 22 becoming Claim 18 of the '946 Patent, were of course new claims. However, together with the patent owner's representations to

the Patent Office it is clear they were added in response to the rejection of claims 1 and 2.

Therefore, they must be considered as part of the prosecution history in determining whether the Doctrine of Prosecution History Estoppel would apply on these facts.

Plaintiffs argued with respect to claims 1 and 2 that those claims:

Clearly define the ... distinction between the present invention and the Landwehrkamp '128 by reciting: *"whereby in order to form a ring of fibers which is suitable for the start-spinning operation the feed of said sliver is switched on for a given period of time prior to said end of said thread being placed on said ring of fibers and the thread being drawn off again, the feed then being interrupted again and finally only switched on again for the actual start-spinning operation."* (Emphasis in original) [DX 27C, Amendment, p. 11; Tr. 819].

Plaintiffs also argued in the Amendment:

It is further submitted that all of the other claims remaining in the application after this amendment, also clearly patentably distinguish over the disclosure or suggestions of [the cited prior art]. Since each of the newly added method and apparatus claims clearly define either method steps or apparatus for performing particular functions *preparatory to and prior to the start-up of a stopped spinning rotor.* to perform a thread-piecing operation, and since the [cited prior art], as well as the other cited references, all fail to disclose or suggest such an arrangement, it is submitted that all of the claims clearly patentably distinguish the invention over the cited prior art. (Emphasis in original; bracketed material added) [DX 27C, Amendment, pp. 11–12; Tr. 819–820].

After the Amendment with the addition of the new claims, the Examiner allowed the application to issue based on the limitations recited in the claims. The allowed application claims were renumbered as patent claims 1–27. Original claims 1 and 2 of

the patent application became, without amendment, claims 1 and 2 of the Patent. Claims 5–7 which were allowed without substantive amendment, became patent claims 3–5. Added application claims 10–29 became patent claims 6–25 with added claim 22 becoming Claim 18. [DX 27C, Amendment, pp. 1–12].

In the June 7, 1977 communication indicating allowance, the Examiner's Statement of Reasons for Allowance were as follows:

> The claims have been allowed primarily because, as pointed out in the Amendment dated 12/9/76, the prior art does not show method or apparatus for preparing the spinning pot *prior* to piecing up on open-end spinning. The prior art shows a series of steps which are started only when piecing is started.

[DX 27C; *see also* Tr. 821].

The Plaintiffs argue that the Examiner allowed the claims in the application not because of any recitations in the claims concerning starting and stopping of the rotor and/or sliver feed during the piecing sequence, but rather, because each of those claims in differing respects define over the Landwehrkamp reference by reciting some form of fiber supply preparing means or step which functions or is carried out *prior to piecing up.* [Plaintiffs' PT Findings of Fact, p. 52].

In view of the Claim 18 language and the Plaintiffs' arguments to the Patent Examiner quoted previously, it appears to the Court that the clear limitations in Claim 18 and the prosecution history are:

(1) a preparatory step performed prior to the start up of a stopped spinning rotor;

(2) starting, operating and then stopping the feeding means (prefeeding); and

(3) the formation of a uniform fiber tuft arranged at the feeding means to accommodate the subsequent piecing operation.

The Court simply does not agree with the Plaintiffs' strained interpretation of the Patent Examiner's Reasons for Allowance that "... the Examiner allowed the claims in the application not because of any recita-

tions in the claims concerning starting and stopping of the rotor and/or sliver feed during the piecing sequence, but rather, because each of those claims in differing respects define over the Landwehrkamp reference by reciting some form of fiber supply preparing means or step which functions or is carried out *prior to piecing up.*" [Plaintiffs' PT Findings of Fact, p. 52].

The Court also does not agree with the Plaintiffs' conclusion on page 53 of their PT Findings of Fact that:

> The range of equivalents now sought by plaintiffs for Claim 18 by which that claim would cover an apparatus in which the fiber supply preparing means prepares the spinning assembly for a piecing operation prior to piecing *regardless of whether such preparation is accomplished before or after the rotor is moved from its stopped position,* is therefore not precluded by prosecution history estoppel because that range of equivalents does not include subject matter which was forfeited by any claim amendment or represented in the applicant's attorney's "Remarks" as being excluded from the scope of Claim 18 *or any other claim in the application.* (Emphasis added).

The Plaintiffs' interpretation flies in the face of the applicants' attorney's "Remarks," the Patent Examiner's reason for rejection and for allowance, and the plain language of the Patent.

Therefore, the Court concludes that the range of equivalents sought by the Plaintiffs for the '946 Patent is precluded by the Prosecution History Estoppel Doctrine, as it applies to the NFRS.

*2. Second Attempt Mode New FRS.*

[14] Moving then to the second issue: "Does the NFRS infringe literally or equivalently on the Suessen machine when operating in the second attempt mode?"

The Plaintiffs contend on P. 23 of their PT Brief that they have shown that Claim 18 reads literally on the NFRS machine when operating in its "second attempt

mode." The Plaintiffs further contend on that same page that each limitation recited in the Claim finds direct correspondence in a portion of the accused machine which is structurally the same or equivalent and functions in the same way.

The Plaintiffs' witness on direct examination testified as follows:

Q. Mr. Bartlett, in the modified FRS machine, when the piecer operates to piece up a particular spinning position, if it is not successful, what does it do?
A. It goes through a second time cycle for piecing up in an identical way again.
Q. Is the second time cycle in any time relation to the first cycle?
A. Yes, it starts off in a time relation to when it decides to stop the first cycle because it hasn't been successful, an exact point in time it stops is, and it goes on and repeats the whole exact cycle again in its own time relation and in time relation to the first cycle. [Tr. 301, L. 4–15].

Bartlett then referred to PX 310 which he testified was a sequence chart he prepared. This chart illustrated that the aborted sliver feed at the end of the first failed attempt to piece up becomes a physical prefeed. That is, a sliver prefeed to the second attempt. [Tr. 304, L. 12–15] [PX 310 is reproduced in reduced form here].

PX 310 contradicts Plaintiffs' contention regarding the "second attempt mode" of the NFRS machine as well as does Plaintiffs' witness Bartlett's direct testimony:

Now, let me show in solid lines with an asterik [sic] there and down at the bottom there's a note on the asterik [sic] that says aborted piecing feed becomes prefeed. Because now the second attempt is going to start where the central dotted line is the middle of this chart of Plaintiffs' Exhibit 310, which says piecing fails.

So, if we look at that line, we see from the sliver feed, the aborted sliver feed of the first attempt, this, in fact, becomes a prefeed before we start the second attempt.

Then the second attempt, the sequence of operations is exactly the same on the right-hand side of this figure as the left, but they're shown in solid line. So now on the top line we stop the rotor because

we've opened on the second line, the spin-box door. The rotor is cleaned while the spinbox door is opened, and the cleaning head, you recall, has a vacuum, a nozzle or vacuum tube, and as I showed on the video, on the original FRS, when the vacuum tube goes in it sucks out fiber and here the fiber from this prefeed, some of which may have been captured in the rotor, will be sucked out by the cleaning vacuum. We then close the door after the cleaning is finished, and we, again, going to the top line, start accelerating the rotor.

Then coming down to the fourth line, now the auxillary [sic] vacuum, the suction vacuum comes on again, and then on the next line we start the sliver again. *Now, the first part of that sliver feed will be sucked out to waste by the fiber suction vacuum above,* but when we get to the end of the fiber suction vacuum, where it's turned off, then from there on the piecing feed starts and the sliver is transported to the rotor and can start being captured in the rotor to make the piecing ring, and immediately below we see the end is dropped in and then the next line down the end is pulled out to make the piecing.

So that we, again, going back, this aborted sliver feed at the end of the first attempt to piece up that fails becomes a physical prefeed, sliver prefeed to the second attempt. And you'll notice it also carries out the correct function that to the left of this now prefeed, we had an unknown fiber beard that was aged and being continuously combed by a rotating opening roll, and we didn't know what that beard was, but when we got to this now prefeed for the second attempt, we eliminated that sliver, that fiber beard, and we formed a known fiber beard, and from there on we kept control of whatever that fiber beard was in timed relation until we got to the piecing point where we had for the piecing feed, we then had a uniform fiber tuft, which we knew what it was, and we used for the piec-ing."

Tr. 303, L. 4–25; 304, L. 1–25 (emphasis added).

According to Bartlett and PX 310, in the second attempt by the NFRS the rotor is stopped, the spinbox door is opened, the rotor is vacuumed, the spinbox door is closed, the rotor is started, the auxiliary vacuum comes on again, the sliver is start-ed, the first part of the sliver feed is sucked to waste, the vacuum deflecting fiber to waste is turned off, the full flow of sliver is transported to the rotor which is operating at spinning speed, the end of the thread is dropped in, and piecing begins.

Without repeating the operation of the '946 machine under Claim 18, it is obvi-ous that the NFRS operation is not equiva-lent to the '946 Patent under Claim 18. The Plaintiffs have conceded that there is no literal infringement of the '946 Patent by the NFRS. Bartlett testified if a piec-ing is not successful it goes through a second time cycle for piecing up in an *iden-tical* way. [Tr. 301, L. 4–8]. Bartlett's testimony and PX 310 indicate that none of the fibers from the first piecing end up in the rotor. Ferro also testified:

... No fibers from the first cycle end up in the second cycle and, therefore, they don't end up in the rotor.

[Tr. 744, L. 4]. Thus, PX 310 and the testimony of both Bartlett and Ferro are the same.

Each of the cycles in the first and second attempt are the same. The mere fact that the second attempt is a repeat cycle of the first attempt does not give any basis for the Plaintiffs' contention that there is ei-ther literal or equivalent infringement of the '946 Patent by the NFRS in the second attempt.

In summary, Claim 18 of the '946 Patent provides for a prefeed sequence prior to every start spinning operation. This pre-feed sequence eliminates the unknown fi-ber tuft which may be either too thick or too thin depending on whether there is a brief standstill or a longer standstill. Thus, when there is a failed piecing at-tempt a precisely defined fiber tuft is cre-ated by starting and stopping the sliver feed in a time controlled sequence. The fiber tuft then permits precise control of

the quantity of fibers fed. According to Claim 18 this preparation of the spinning assembly for a piecing operation occurs "... prior to the movement of the spinning rotor from its stopped position."

In contrast, when there is a thread break in the NFRS machine there is a recycling of the system and the second attempt is identical to the first attempt, and the process proceeds as previously set out. In the NFRS there is no fiber supply preparing means which operates prior to the movement of the spinning rotor from its stopped position. This sequence occurs whether it is the first, second or any subsequent attempt. There is no fiber supply preparing means prior to starting the rotor, and no "uniform tufts." The NFRS simply does not include every element of Claim 18, either literally or equivalently. Each piecing attempt of the NFRS is a totally separate and complete procedure, there are no fibers in the rotor from the first, second or any other prior attempt; no precise, repeatable, and identical time after the previous attempt failed, no fibers from the previous attempt used in the subsequent attempt, and no preparation of the spinning assembly prior to the movement of the rotor. In short there is no literal or equivalent infringement of the '946 Patent by the NFRS in the first or any subsequent attempt to piece up.

### 3. *Prior Art.*

■ We turn now to the third issue: "Is claim 18 of the '946 Patent invalid over the prior art under 35 U.S.C. § 103, particularly in view of Plaintiffs' attempt to broaden the interpretation of claim 18 to include 'Fiber Deflection Art,' the 'BD–200 Art' and the 'Repeat Art'?"

Title 35, Sec. 103 reads as follows:

**§ 103. Conditions for Patentability; non-obvious subject matter**

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

This Court has found that there is no infringement of the '946 Patent by the NFRS, either literally or under the doctrine of equivalents.

As the Federal Circuit has said:

Infringement *may* be found under the doctrine of equivalents if an accused product performs substantially the same overall function or work, in substantially the same way, to obtain substantially the same overall result as the claimed invention (citations omitted). Even if this test is met, however, there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass the prior art (citations omitted). This issue—whether an asserted range of equivalents would cover what is already in the public domain—is one of law which we review *de novo.*

*Wilson Sporting Goods v. David Geoffrey & Assoc.,* 904 F.2d 677, 683 (Fed.Cir.1990) (citations omitted).

The court had earlier stated:

When presented with patent validity and infringement issues, trial courts should, as Judge Boyle did here, decide both. First, the parties, witnesses and exhibits involved in both issues are before the court. If a judgment limited to one issue is reversed, it may become necessary to again call many of the same persons before the court for trial or argument on the other. In any event, a remand would normally be necessary for a return by the trial court to whatever fact finding process may be involved in a determination of the undecided issue. Second, a finding that a claimed invention has or has not been appropriated by the alleged infringer may carry substantial weight in a court's analysis of all the evidence bearing on the obvious-nonobvious issue. An alleged infringer's lauding of all the available prior art may, for example, in some cases have a hollow

ring when played against its disregard of that art and its copying of the invention. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed.Cir.1983),

The Defendants contend:

The sole difference between the '946 Patent and Stahlecker et al. '610 and Miyazaki et al. '352 is the inclusion of a preparatory step of sliver prefeeding. This step was well-known to those skilled in the art in the semi-automatic OES art, and those skilled in the art at the time the '946 invention was made would have considered it an obvious and logical step to incorporate such a sliver prefeeding as in the prior art into the automatic piecing systems of any of Stahlecker et al. '610 and Miyazaki et al. '352. [DX 23 and 40].

PT Findings of Fact and Conclusions of Law p. 108, par. 267.

Defendants further state:

... Defendants have presented the testimony of Dr. Vaughn on the "level of one of ordinary skill in the art" in OES technology at the time of the '946 Patent, which also was not in the record in the South Carolina litigation ('85 And. p. 64). Still further, in the South Carolina litigation, the issue of whether or not manual prefeed was ever utilized in the United States was hotly contested (and the Court found that Defendants therein failed in their proofs), while in the present litigation, the evidence of use and knowledge of prefeeding in the United States is overwhelming and, in fact, has been stipulated to between the parties [DX 14, 19, 20, 21, 45 and 72B]. Under similar circumstances, a prior decision in favor of a patentee has been disregarded. *RCA Corp. v. Data General Corp.*, 701 F.Supp. 456, 463 (D.Del. 1988).

*Id.* at 111–12, par. 275.

Dr. Vaughn's testimony on cross-examination pertinent to this issue was as follows:

Q. Okay. You said the BD–200 and Miyazaki?

A. I said that, yes.

Q. Now, which of those then eliminate the aged fiber beard while preventing the unknown quantity of fibers therefrom from being captured in the rotor of the piecing?

A. Those two.

Q. Okay. Which then of those, the BD–200 and the Miyazaki, produce in the rotor groove a fiber piecing ring of a known fiber quantity?

A. They both can.

Q. Where is the teaching that they do?

A. If you have a consistent cycle with manual piecing and do it the same way each time, you can achieve that.

Q. With the same timing every time?

A. I said if you have manual piecing and you perform the same functions in the same time frame each time, you can achieve that.

Q. Well, who did that?

A. I'm sure someone around the world did it. There have been millions and millions of people piecing.

Q. The weren't doing it on the film, though, were they?

A. Not necessarily, no.

Q. Did you seem them doing it on the film?

A. Those are excerpts from that film. I can't testify to every, each time, every time, but it is possible.

Q. And which of the prior art between BD–200 and the Miyazaki piece with known fiber ring?

A. What do you mean by known fiber ring?

Q. You know how much fiber is in the ring when you piece up, before you piece up.

A. A specified quantity of fiber?

Q. Yes, sir.

A. Again, as in the last answer, if one does it the same way, then you can achieve that.

Q. If one does it the same way?

A. It's possible.

Q. And which of the two pieces of prior art, the Miyazaki and the BD–200, produce consistently uniform piecing points of high quality?

A. One has to determine what—sounds like a sales literature, again, of high quality—what is the definition of high quality, but consistently uniform piecing points, if one does the same piecing the same way each time, one should be able to achieve that. It has a uniform—

Q. Where is there any teaching in the prior art of doing that?

A. —in a uniform fiber feed. There's some teaching in Rohlena's book about that, talking about piecing and the importance of consistency with piecing.

Q. And does Rohlena say you prefeed for two to three seconds?

A. Rohlena does not prefeed.

Q. But two to three seconds.

A. That's correct.

Q. Is that consistently uniform?

A. Depends. That's a general statement, two to three seconds. Depends on what you're spinning. Depends on what the yarn count is. That's what that statement means.

Q. That's what it means to you?

A. That's what it means to me.

Q. How many seconds would the girls on the film, in the Czech film, prefeeding?

A. I don't know. I didn't measure that.

Q. Do you think they're always the same?

A. No, I'm sure they weren't always the same because they were not intended to be all the same. They were illustrating different things at different times. We were also illustrating poor piecing.

Q. Also illustrating what?

A. We were also illustrating—it was also being done there and I used as an illustration what happens when you prefeed the wrong time. Many things on that film.

Tr. at 667–69.

Further, the Exhibits DX 14, 19, 20, and 21 all refer to the yarn detector lever of the BD–200 being activated by an operator for a brief time, for example two to three seconds, a so-called preliminary feed. None of the testimony or exhibits referred to by Defendants provide for a uniform tuft as provided for in the '946 Patent.

The problem which the '946 Patent addressed and was designed to solve was the different appearance and varying strengths of the start spinning points.

The solution by the '946 Patent was that prior to every start spinning operation, a precisely defined fiber tuft, which always recurs in the same shape, is produced by briefly switching on the fiber feed for a given period of time prior to the end of the thread being placed on the ring of fibers and the thread being drawn off again, the feed then being interrupted again and finally only switched on again for the actual start spinning operation.

 Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, or failure of others, may be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. *Graham v. John Deer Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1965).

It is true as contended by the Defendants that prior to December 7, 1974 VUB was aware of the importance of fiber tuft preparation, and that they developed the science for the preparation of fiber tufts with known masses and shapes and that VUB disclosed the preparation of a fiber tuft in *Open–End Spinning* by Vaclav Rohlena, et al., published in 1974. [DX 10]. The importance of a known fiber tuft was incorporated into the piecing operation of the BD–200 machine and prefeeding was made a standard procedure in the technique of mending yarn breaks. Moreover, Rohlena discusses prefeeding in the subsection entitled "The Technique of Mending Yarn Breaks." On PP. 323–325, Rohlena disclosed a method for enabling the tuft of fiber to come in contact with the combing

roller for 2–3 seconds. All that is true, but none of those methods address the object and purpose of the '946 Patent: to permit even more precise control of sliver feed than previously possible so that the quantity of fibers fed during the start spinning operation can be matched to the start spinning speed even more precisely than had previously been the case. [DX 27A, '946 Patent Col. 1, L. 57–62]. Further, there was never a method in the prior art which has been brought to the attention of this Court for switching on the sliver feed for a given period of time and then switching it off to obtain a precisely defined uniform fiber tuft.

According to Rohlena, the prototype BD–200 was introduced in 1965. In 1967, a license agreement was signed by Japanese Companies with Czechoslovakia for production of BD–200 machines. They have been exported throughout the world with a great number in East Germany and England. Rohlena at 21–22. Rohlena also discusses the technique of mending yarn breaks. Rohlena at 323.

Dr. Vaughn testified that the level of ordinary skill of one in the art of open-end rotor spinning would be an individual who had a Bachelor's degree in mechanical engineering or classic textile technology or textile science and three to five years of experience with spinning and spinning operations and some familiarity with open-end spinning. [Tr. 586]. Dr. Vaughn testified further that if such a person had knowledge of the BD–200 and the '610 Patent in front of him, the solution to the '946 Patent would be to incorporate a prefeed in the '610 Patent. [Tr. 597–98]. Dr. Vaughn's opinion consisted of conclusions without any supporting explanations.

If the '946 system were as obvious as Dr. Vaughn testified, then it would appear to the Court that the same inventors who invented the '610 Patent [DX 23] filed November 29, 1974 would have been able to incorporate Claim 18 of the '946 Patent [DX 27A] in the '610 Patent filed approximately one year earlier.

The difficulty which attaches to all honest attempts to answer this question (non-obviousness vs. obviousness) can be attributed to the strong temptation to rely on hindsight while undertaking this evaluation. It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit. Monday morning quarterbacking is quite improper when resolving the question of nonobviousness in a court of law.
*Orthopedic Equipment Co., Inc. v. United States,* 702 F.2d 1005, 1012 (Fed.Cir.1983).

Claim 20 of the '610 Patent provided for an apparatus for start spinning a thread as follows:

20. An apparatus for start-spinning a thread on an open-end spinning unit of an open-end spinning machine, said apparatus comprising:

reducing means for reducing the speed of a spinning rotor of said spinning unit to a speed below its operational spinning speed.

intervening means for intervening in at least one of the drive and control of sliver feed means of said spinning unit so as to control the volume of fibres deposited by said sliver feed in said spinning rotor,

placing means for placing an end of a thread piece on a ring of fibres deposited in said spinning rotor and drawing said thread piece out of said spinning rotor upon connection of said end with said fibres.

and controlling means for controlling the speed of said rotor and the timing of said intervening step such that the rotor is accelerating toward said operational spinning speed during said placing by said placing means.

Nowhere in Claim 20 of the '610 Patent is a uniform fiber tuft mentioned. In fact, nowhere in the Patent has the Court found any reference to a uniform fiber tuft.

Defendants' expert, Dr. Vaughn, testified on cross-examination that in the BD–200 when the yarn breaks there is an unknown fiber beard and that it is replaced with a unknown fiber beard when spinning is started again. [Tr. 634].

Dr. Vaughn further on redirect testified as follows:

Q. Thank you. Now, Dr. Vaughn, you also mentioned that in the BD–200 there was an unknown, there was a replacement of unknown quantity in the fiber beard with an unknown quantity—and you end up with an unknown quantity of fiber beard. What did you mean by that statement?

A. Did I say that?

Q. I think so.

MR. PARK: I made the statement and he agreed with me.

MR. ROUX: Oh, okay.

THE WITNESS: You want me to answer what I meant?

Q. Well, that's better. Did you know what Mr. Park meant by that statement, replace an unknown quantity in the fiber beard—

A. By an unknown quantity in the fiber beard, that doesn't make sense. I remember what I was responding to, what I thought I was responding to. Perhaps I wasn't listening well. If you start with an unknown quantity in the fiber beard, then you end up with an unknown quantity available for piecing, and I said that's true, and that is true on the BD–200 machine, and the reason that it is true on the BD–200 machine, when you prefeed and remove damaged fiber and then stop the prefeed, there is an uncontrolled time between the stopping of the prefeed, or an inconsistent time between the stopping of the prefeed and the starting again of the feed for piecing, and because that time is not the same time each time, the amount of fiber that is available for piecing will not be the same each time every time, and I was reflecting that upon what I had said earlier about the comparison of the BD–200 system with the FRS machine.

The Court concludes that neither the '610, nor the BD–200 nor the combination of the two render Claim 18 of the '946 Patent obvious.

4. *Section 102(b) Defense.*

■ This brings us to the fourth issue.

4. Is claim 18 of the '946 Patent invalid under 35 U.S.C. §§ 102(b) and 103 in view of the "on sale" activities of the Plaintiffs with respect to the subject matter of the '946 Patent in the U.S. more than one year prior to the filing date of the '946 application in this country?

Title 35 U.S.C. § 102(b) states:

A person shall be entitled to a patent unless:

. . . .

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the U.S.

The burden on this issue is on the Defendant to prove by clear and convincing evidence that the *invention* was *on sale* more than one year prior to the date of application for the Patent in the U.S.

The first determination for the Court to make, then, is what do the words "the invention" encompass in the statute. In patent law an invention is a concept, a thing involved in the mind—the creation of something which did not exist before.

The party asserting the on sale bar must prove by "clear and convincing evidence, that there was a *definite sale or offer* to sell more than one year before the application for the subject patent, and that the subject matter of the sale or offer to sell fully anticipated the claimed invention or would have rendered the claimed invention obvious by its addition to the prior art." Whether an invention is on sale is a question of law, and no single finding or conclusion is a *sine qua non* to its resolution. "[T]he totality of the circumstances must always be considered in order to ascertain whether an offer of the new invention was in fact made." The totality of the circumstances approach is necessary because "the policies or purposes underlying the on sale bar, in effect, define it." These policies include discouraging removal of inventions from the public domain that

the public reasonably has come to believe are freely available; favoring the prompt and widespread disclosure of inventions; allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and prohibiting the inventor from commercially exploiting his invention beyond the statutorily prescribed time.

*Envirotech Corp. v. Westech Engineering Inc.*, 904 F.2d 1571, 1574 (Fed.Cir.1990) (Citations omitted) (Emphasis added).

■■■ The '946 Patent application was filed in the U.S. on December 2, 1975, and thus, the critical date for an "on sale" bar is December 2, 1974. The first question, then, is was there clear and convincing evidence of a definite sale or an offer to sell an embodiment of the claimed invention before December 2, 1974? To answer this question, three factors must be considered. *First*, absent inequitable conduct in prosecution of the application, a patent is invalid under § 102(b) only if every element in every claim in the issued patent reads on the device offered for sale. 35 U.S.C. § 102(b); (citations omitted). *Stein Associates v. Heat and Control, Inc.*, 748 F.2d 653, 656 (Fed.Cir.1984). *Second*, the invention must have been reduced to sufficiently tangible form to demonstrate that it will work for its intended purpose. *General Electric Co. v. United States*, 654 F.2d 55, 62, 228 Ct.Cl. 192 (Fed.Cir.1981). Under precedent, there cannot be a reduction to practice of the invention here without a physical embodiment which includes all limitations of the claim. *UMC Electronics Co. v. U.S.*, 816 F.2d 647, 652 (Fed.Cir. 1987). *Third*, "... an assignment or sale of the rights in the invention and potential patent rights is not a sale of the invention within the meaning of section 102(b).... The few cases we have found on this issue have uniformly held that such a sale of patent rights does not come within the section 102(b) bar." *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1267 (Fed.Cir.1986) (Citations omitted).

The evidence is that there was a license agreement between Barber–Colman and Suessen and WST dated November 20, 1973. [DX 146]. That license agreement contained an option to acquire the exclusive right to manufacture in the United States the Spincat, Cleancat, and any improvements with respect to either of them. Barber–Colman did not exercise that option. Barber–Colman did market a machine in the United States beginning in 1975. The Plaintiffs first supplied automation to Barber–Colman in late 1976 or early 1977 and offered a machine with automation in the U.S. in late 1976 or 1977. [Tr. 155–156].

In the Eiss declaration [DX 146], Mr. Eiss said that he was shown a Spincat in operation at WST in 1973 and observed the Spincat automatically piece up and repair a thread break. Mr. Hans Stahlecker testified that he recalled the Eiss visit in 1973 and that he told Mr. Eiss that the Plaintiffs had developed an automated piecing device designed to operate in conjunction with Suessen's spinbox, but that WST had not completed the device as of 1973. [Tr. 157].

Mr. Hans Stahlecker further testified that neither he nor anyone with authority told Eiss in 1973 that Suessen was looking for purchasers of Suessen's automated piecing devices because Suessen had not yet completed the development. [Tr. 157–158].

The Defendants contend that the November 20, 1973 License Agreement between Suessen and the Barber–Colman Company [hereinafter BCC] [DX 146], in conjunction with its underlying intent and surrounding circumstances, as well as the substantial valuable consideration transferred by BCC to Suessen for the license agreement, establishes a commercialization of the subject matter of the '946 Patent triggering the "on sale" provisions of 35 U.S.C. § 102(b).

Keeping in mind that the Defendants have the burden to prove that the "invention," or that which renders the invention "obvious", be "on sale" by clear and convincing evidence (i.e., evidence which convinces the trier of fact that the truth of the contentions are highly probable). The Court does not believe Defendants have met this burden.

As its title implies, the BCC Agreement was a License Agreement to manufacture and a non-exclusive right to use and sell open-end spinning machines under the patents of Suessen with respect to open-end spinning.

Article II of the Agreement provides that Suessen grants to BCC the exclusive right to manufacture and the non-exclusive right to use and sell open-end spinning machines under the patents/patent applications of Suessen with respect to open-end rotor spinning. Article II provides further that the patents and patent applications for the Spintester and the Spinbox are listed in Exhibit "A" to the License Agreement. The '946 Patent is not listed. Article VIII, of the Agreement extends from Suessen to BCC an option to acquire the exclusive right to manufacture in the United States, the Spincat, the Cleancat, and any developments or improvements with respect to either of them or other technology or components in any way related to open-end rotor spinning. [Tr. 62].

The option clause Article VIII referred only to the Spincat and Cleancat. The license to manufacture and sell in Article II referred only to the Spintester and the Spinbox, not to the Spincat or Cleancat. This is contrary to the Eiss Declaration, but conforms to Hans Stahlecker's testimony and to the Agreement. It is clear from the Agreement and the credible testimony at trial that the Robert G. Eiss statement is in error when he states that Spincat and Cleancat were sold in the same manner as the Spintester and Spinbox. [DX 146 and Tr. 154–162].

The next question is whether there were actual sales of the Spincat made prior to the critical date. Whether an invention is on sale is a question of law. The Defendants contend that the written license agreement further gives BCC the option to acquire the exclusive right to manufacture in the United States the Spincat and Cleancat apparatuses under all of Suessen's patents in existence as of November 20, 1973, or which may come into being in the future, covering the Spincat and Cleancat. The Defendants further contend that the

written license agreement, which relates by its terms to "future patents," includes the '946 Patent. [DX 146 and the Eiss Declaration, ¶ 15, Exhibit "A"].

In the first place, the Eiss Declaration is not entitled to the same credibility as a witness appearing at trial. Eiss made a number of statements concerning the meaning of the license agreement which were not supported by evidence, whether in the form of documentation or live testimony.

For example, Eiss states he was informed Suessen was looking for purchasers of and licensees for its open-end spinning equipment and related technology. [DX 146, ¶ 5, p. 2]. This statement was denied by Hans Stahlecker who testified at trial. [Tr. 157–158]. Mr. Hans Stahlecker testified that neither he nor anyone at Suessen told Eiss that Suessen was looking for purchasers of Suessen's automated piecing device because Suessen had not completed its development. Hans Stahlecker further testified that no decision had been made by Suessen about manufacturing the automated piecing device until shortly before the Milan exhibition in 1975 [Tr. 158–159].

Again, the Eiss Declaration states:

The November 20, 1973 license agreement between Barber–Colman and Suessen contains in Par. 8.1 an option for Barber–Colman to obtain the exclusive right to manufacture the spincat in the United States. The intent of this paragraph of the license agreement was a protective provision in favor of Barber–Colman so that in the event Suessen could not meet Barber–Colman's requirements for spincats, Barber–Colman would have the right to manufacture SpinCats in the U.S. As a result of the November 20, 1973 license agreement between Barber–Colman and Suessen, Suessen provided a full set of blueprints for the SpinCats to Barber–Colman.

[DX 146, ¶ 17].

Mr. Hans Stahlecker testified that if what Eiss said in the Declaration was correct, it would have been written in the License Agreement as it was regarding

spinboxes. [Tr. 161]. The Agreement does state: "Spinboxes may be manufactured by Barber–Colman at its own works or Barber–Colman may sub contract...." [PX 112, ¶ 19].

Again, in the Eiss Declaration it is stated:

As part of the November 29, 1973 license agreement, sales of the spincat were to be made by Barber–Colman through American Suessen Corporation, located in Charlotte, N.C. Barber–Colman was to place orders for the spincat with American Suessen Corporation. American Suessen was to forward the orders received from Barber–Colman to Suessen and the orders were to be filled directly by Suessen to Barber–Colman.

[DX 146, ¶ 19].

Hans Stahlecker testified that at the time of the agreement Suessen had not yet made a decision whether it would manufacture that equipment at all, if and when it was fully developed. He further testified:

At the time we could only tell them that we are working on something, and the only thing which was agreed upon in respect to automation was that they would have an option to acquire a license not more, not less. It's clearly stipulated in the agreement.

[Tr. 162].

Further, a March 13, 1974 letter from Fritz Stahlecker to R.G. Eiss reads as follows:

As regards the SpinnKat we have made fairly good progress. The second prototype is at present being assembled and is expected to start at the end of this month or beginning of April. The second prototype has been designed in such a way that its principal features correspond to the definite design.

I shall let you know as soon as the new SpinnKat is ready for performance and I would be very pleased if you would come over to Germany for seeing this unit and for a discussion of our further proceedings.

[PX 222, ¶ 5].

In a May 12, 1975 letter from Fritz Stahlecker to Barber–Colman, Fritz Stahlecker states:

*Spincat*

Dear Bob,

[A]ttached to this letter we are sending you some drawings relating to the Spincat. By means of these drawings you will be able to gather the main dimensions you require for adapting the unit to your machine. Further documents will be addressed to you within shortly.

We recommend to investigate already now the possibilities of how to place the slide rails. The weight of the Spincat amounts to approx. 150 kgs, the weight of the Cleaningcat to approx. 90 kgs.

We are pleased to tell you that we have now manufactured our third prototype and that it is operating very satisfactorily.

In addition, Hans Stahlecker testified:

Q. Does this letter refresh your recollection as to when you completed your spincat development?

A. It must have been, as I said before, around middle of '75, because if my recollection is correct, the Milan exhibition took place either September or October, '75, and before this exhibition we had completed our development work, at least to such an extent that we could say, it's now functioning, and this letter indicates that in May, '75, my brother felt confident enough to give some dimensions to Barber–Colman, external dimensions of this automation in order to allow Barber–Colman to design a connection points on their machine in such a way that this Barber–Colman machine could then at a later date be equipped with this automation device.

Q. Where do you get that from the letter?

A. Because he says, "Attached to this letter, we are sending you some drawings related to the spincat. By means of these drawings, you will be able to gather the main dimensions you require for adapting the unit to your machine."

[Tr. 165].

Finally, on May 26, 1975, Eiss wrote Fritz Stahlecker as follows:

Re: *SPINKAT*

Dear Fritz:

I acknowledge receipt of your May 12 letter (FST/mi-ws) and the drawings relating to SPINKAT.

We are very anxious to receive additional information on your development. There is a great deal of talk about who will be the first to have an efficient piecing-up device. We certainly hope it will be Suessen/Barber–Colman.

Have you made a final decision regarding showing SPINKAT in Milan? If you show SPINKAT will you also be ready to show CLEANKAT? We would like to see both of these units and discuss with you the details of operation prior to the Milan Show. The question is when and where should we do this. I would imagine you will be shipping the units to Milan 3 or 4 weeks before the Show. Perhaps you would want to conduct a pre-show seminar in Milan. In any event, we definitely want to be prepared to discuss this new equipment with customers. We will await your advice as to when and where you would prefer to show us the two KATS.

[PX 232].

In response to that letter Fritz Stahlecker wrote Eiss on June 3, 1975 as follows:

3 June 1975
FST/mi-hs

Dear Bob,

Re SPINCAT

Many thanks for your letter of 26th May, 1975.

We shall shortly send additional data and information on the SpinCat and also on the Cleaning Cat; we do hope that we will be able to show both units at the Milano Fair; as a matter of fact, we have made some progress in the technical development of these components.

If I see things correctly, a good solution has been found to all the fundamental features. Our third prototype has now been running for one month, this prototype combines the SpinCat and the CleaningCat which are giving satisfactory performance as was intended.

I, too, think it would be very important for us to meet in good time before the opening of the Fair, in order to exchange information and to discuss and agree on the policy to be followed in our demonstrations and talks in Milano.

As the SpinCat as well as the Cleaning-Cat are now available almost in their definite design, I should be very happy if you would come over to Germany and visit us at Suessen and Reichenbach in order to discuss these significant questions. I think it would be most useful for all of us if you would be able to visit us soon.

[PX 233].

Hans Stahlecker testified that the third paragraph in the letter above means to him that Suessen's decision to proceed with the Spincat and Cleancat was in preparation shortly before the Milan exhibition. [Tr. 169]. Further a memo dated June 2, 1976 indicated that BCC would most probably send an order for one Spincat/Cleancat by the end of May, 1976, with the intention to carry out tests in mill practice. [PX 243].

Defendants further contended that in November of 1974, the Plaintiffs indicated the Spincat was operational and was to be demonstrated at the Milan ITMA show in the Fall of 1975. Hans Stahlecker explained this as follows:

Q. Isn't it a fact, however, that the spincat was, in fact, running as of November 15th–14th, 15th, 1974?

A. I gather from this document that it must have been running. However, it does not state how it was running, whether we have been already satisfied with the operation of the equipment.

[DX 144J, p. 3 and Tr. 182–183].

In view of the direct conflict between the testimony and documents alluded to above, the Court concludes that the Eiss Declaration was incorrect in a number of instances and does not support the statements of Eiss or of the Defendants that as of September 21, 1973 there was in existence a Spincat apparatus which embodied the prefeed subject matter of the '946 Patent— specifically each limitation contained in the fiber supply preparing means of Claim 18.

Defendants contend that Hans Stahlecker testified at his deposition that the written agreement *obliged* Barber–Colman to buy both Suessen's spinboxes and Suessen's automation from Suessen. [PT Findings of Fact, ¶ 298]. That is not exactly what Hans Stahlecker testified, nor is that what the License Agreement provided.

First, the License Agreement in paragraph 1.5 states:

For the purpose of ensuring SUESSEN of the most economical manufacture of Spinnboxes, BARBER–COLMAN shall incorporate only SUESSEN Spinnboxes (Rotor Box and Opener Box) into all Open–End Spinning Machines manufactured by BARBER–COLMAN and shall purchase such Spinnboxes exclusively from SUESSEN or any other company designated by SUESSEN, except as provided in paragraph 1.7 below.

[DX 146, ¶ 1.5].

Second, the License Agreement in paragraph 8.1 states:

*Article VIII. Cooperation on Open–End Spinning*

During the currency of this Agreement, SUESSEN hereby extends to BARBER–COLMAN an option to acquire the exclusive right to manufacture, in the United States, the Spin Kat, the Clean Kat and any developments and improvements with respect to either of them, or other technology or components in any way related to Open–End Spinning. Such patent applications are listed on Exhibit "C" and all future patents relating thereto shall be deemed to be included herein.

[DX 146, ¶ 8.1].

Consistent with that, Hans Stahlecker testified that Suessen had a license agreement with Barber–Colman in the early seventies and further:

Q. What was the subject matter of that agreement?

A. Barber–Colman was entitled to make use of our patents, of our technology and was obliged to buy the spinboxes and the automation equipment from Suessen.

Q. Did Barber–Colman—part of the agreement was for Barber–Colman to incorporate the spinbox into an open-end spinning machine?

A. Yes.

Q. Did they do so?

A. Yes.

[Tr. 389].

Thus, both the testimony by Hans Stahlecker and the License Agreement refute the Defendants' contention that Hans Stahlecker testified that, and the written agreement *obliged*, Barber–Colman to buy both Suessen's spinboxes and Suessen's automation from Suessen.

It is clear that Barber–Colman was *obliged* only to incorporate Suessen spinboxes (rotor box and opener box) into open-end spinning machines manufactured by Barber–Colman. Further, Barber–Colman had only an *option* to "acquire the right to manufacture" the Spincat and the Cleancat and any developments and improvements with respect to either of them. Likewise, Hans Stahlecker's testimony agrees that Barber–Colman was entitled to make use of Suessen's patents and technology and was obliged to buy spinboxes and the automation equipment from Suessen. There is a difference.

The burden is on the Defendants to prove by clear and convincing evidence that the invention was on sale in the U.S. more than one year prior to the date of application for the patent in the U.S., December 2, 1975. Thus, the critical date is December 2, 1974.

In reaching its conclusion, the Court must consider the totality of the circumstances to ascertain whether there was a definite sale or offer to sell more than one year before the application date of the Patent.

The Court determines that under the totality of the circumstances there was not a definite offer to sell the invention more than one year before the application for the patent.

At most Suessen, under paragraph 8.1 of the License Agreement made an offer in the form of an option for Barber–Colman to acquire the exclusive right to acquire the Spincat, the Cleancat and any develop-

ments and improvements with respect to either of them.

An option to acquire rights to manufacture an invention and potential patent rights is not a sale of the invention within Sec. 102(b). *Moleculon Research Corp. v. C.B.S. Inc.*, 793 F.2d 1261, 1267 (Fed.Cir.1986). The Court finds that the invention of the Spincat was not completed until about May of 1975. [Tr. 165]. The burden is on the Defendants in this case to prove by clear and convincing evidence that the invention was reduced to a sufficiently tangible form to demonstrate that it will work for its intended purpose. This must be accomplished prior to the alleged sale. *General Elec. Co. v. U.S.*, 654 F.2d 55, 62, 228 Ct.Cl. 192 (Fed.Cir.1981). The Court concludes that this was not accomplished until about May 1975.

There was no evidence that on the date of the License Agreement, November 20, 1973, that the optionee, Barber–Colman, knew how the invention would perform. Where a sales contract has been entered into before the critical date, the invention must be complete at least to such an extent that the purchaser knows how it will perform. The invention must have been sufficiently tested to demonstrate that it will work for its intended purpose. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 623 (Fed.Cir.1985).

In short, after considering the totality of the circumstances, the Defendants have not met their burden by clear and convincing evidence that the '946 Patent was "on sale" prior to December 2, 1974, and therefore invalid within the meaning of 35 U.S.C. § 102(b). *Envirotech Corp.*, 904 F.2d at 1574–75.

### 5. *Best Mode.*

This brings us to the fifth issue: "Is claim 18 of the '946 Patent invalid because the invention did not set forth the "best mode" contemplated by them for carrying out the invention of Claim 18 of the '946 Patent as required by 35 U.S.C. § 112?

Section 112 of Title 35 reads in pertinent part as follows:

§ 112. Specification.

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

Defendants' first argument is that the "best mode" of the SpinCat Apparatus was in existence long prior to the Filing Date of the '946 Patent.

The essence of the best mode requirement requires an inventor to disclose the best mode *contemplated by him,* as of the time he executes the application, of carrying out his invention. Manifestly, the sole purpose of the requirement is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their invention which they have in fact conceived. *Chemcast Corp. v. Arco Industries Corp.*, 913 F.2d 923, 926 (Fed.Cir.1990) (Citations omitted). "Mode" is defined as the manner in which a thing is done. "Embody" is defined as "to incorporate."

So, the question is, was the best manner of carrying out the invention contemplated by the inventor incorporated into the specifications?

The best mode inquiry focuses on the inventor's state of mind as of the time he filed his application—a subjective, factual question. But this focus is not exclusive. Our statements that "there is no objective standard by which to judge the adequacy of a best mode disclosure" and that "only evidence of concealment (accidental or intentional) is to be considered," assumed that both the level of skill in the art and the scope of the claimed invention were additional, objective metes and bounds of a best mode disclosure.

Of necessity, the disclosure required by section 112 is directed to those skilled in the art. Therefore, one must consider the level of skill in the relevant art in

determining whether a specification discloses the best mode. We have consistently recognized that whether a best mode disclosure is adequate, that is, whether the inventor concealed a better mode of practicing his invention than he disclosed, is a function of not only what the inventor knew but also how one skilled in the art would have understood his disclosure. (Citations omitted).

*Chemcast Corp. v. Arco Industries Corp.,* 913 F.2d 923, 926–27 (Fed.Cir.1990).

Because not complying with the best mode requirement amounts to concealing the preferred mode contemplated by the applicant at the time of filing, in order to find that the best mode requirement is not satisfied, it must be shown that the applicant knew of and concealed a better mode than was disclosed. *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1384–85 (Fed.Cir.1986). The Defendants claim that the Plaintiffs failed to disclose the best mode of the method of obtaining a uniform Fiber Tuft.

The Court disagrees. In Column 2, Lines 9–31 of the '946 Patent, the specifications very clearly point out that the fiber tuft is dependent upon the standstill period following which the sliver feed is started again. That part of the specification reads as follows:

The present invention is based upon the realization that the sliver feed can only actually be precisely controlled if it can be assumed that the fiber tuft offered to the open roller at the beginning of the sliver feed prior to the start-spinning operation is always the same. This was not always so in many cases. Tests have shown that the nature of the fiber tuft is greatly dependent upon the standstill period following which the sliver feed is started again. If a second start-spinning operation with controlled feed of the sliver is performed after a very brief standstill period, for example after an unsuccessful start-spinning attempt, the fiber tuft will be significantly thicker than would be the case after a long standstill period, after which the fiber tuft would have been heavily combed and

become correspondingly thin. Consequently, in spite of precisely maintained uniform sliver-feed starting conditions, different quantities will be fed. According to the present invention, this possibility is eliminated in that prior to every start-spinning operation a precisely defined fiber tuft, which always recurs in the same shape, is produced by briefly switching on the sliver feed; the fiber tuft then permits precise control of the quantity of fibers fed.

The Defendants complain that no time period Tu–Tv is disclosed in the '946 Patent.

Column 3, Lines 56–68 of the Specifications in the '946 Patent clearly explain that the timing is variable. The shorter the standstill period, the higher the fiber remainder Qr. (See Fig. 2). There is no single best time and no single best quantity Qr contemplated by the invention [Tr. 73–76].

Column 3, Lines 56–68 read as follows:

As already mentioned above, quantity Q'A depends upon how strongly the fiber tuft offered to the opener roller has been combed. How strongly the fiber tuft has been combed is a function of the period of time during which the opener roller still combs after the feed has been switched off. In this connection, combing occurs generally in accordance with an exponential function, which is illustrated in FIG. 2 as dash-dotted curve 5b. FIG. 2 thus shows quite clearly that the standstill period, i.e., the period between time Tv of stopping and the commencement of the sliver feed, is of significant influence for the actual controlling operation. The shorter the stand-still period, the higher the fiber remainder Qr

Column 4, Lines 1–11 continues:

In order to provide proper control of the quantity of fibers being fed, the present invention stipulates that before the actual start-spinning operation and the sliver feed occurring in the connection therewith, there is a sliver feed operation at time Tu which is then switched off again at time Tv, thereby providing a precisely defined standstill period for the sliver feed, causing the same remainder

Qr to be provided in all cases, so that precise control of the start-spinning quantity Q'a is then achieved on the basis of this remainder Qr and start-spinning quantity Q'a is the same in all cases.

Patents are not production documents and nothing in the patent law requires that a patentee disclose data, dimensions, and drawings not necessary to enable one skilled in the art to practice the invention. *Christianson v. Colt Industries Operating Corp.,* 822 F.2d 1544, 1562 (Fed.Cir.1987).

The timing sequences necessary for piecing are dependent upon several factors which include without limitation the count and type of sliver being used, the count and type of yarn being produced, the particular rotor diameter being employed and the machine speed [Tr. 73–76]. Therefore, the disclosure of certain known specific timing sequences, which were applicable only to the experimental conditions of WST's laboratory for certain yarn specifications, would have been more confusing than beneficial to one skilled in the art.

Thus, the fact that the '946 Patent did not disclose the specific timing sequences for the yarn specifications developed by WST prior to December 7, 1974 did not constitute a failure to disclose the best mode contemplated by the inventors for carrying out their invention.

*Longer Combing Time on Shorter Fibers*

The Defendants contend that Lauschke's draft patent application also recited that piecing with shorter fibers (due to a longer standstill period T₁ and combing out time) was the advantageous way to effect piecing, (referring to Dauster's testimony at Tr. 976–77). The Court does not find any statement there that the short fibers resulted in the most advantageous way to create a fiber tuft. What Dauster said is as follows:

Q. Did you have any involvement in the preparation of the original German application which formed the basis for the patent in suit?

A. Yes, I wrote the final version, the version which was filed by using the draft which Mr. Lauschke did send to me.

Q. Can you identify Plaintiffs' Exhibit 116(A) as that draft?

A. Yes, this is that draft.

Q. Now, in comparing that draft with the application which you drafted, that formed the basis for the '946 Patent, there are some differences. Is that correct?

A. Yes.

Q. I want you to particularly focus on the difference [sic] that relate to the use of the shortened fibers in the piecing point and Figure 3 shown in Defendants' Exhibit 116(A).

A. Okay. First of all, I thought that Figure 3 of Mr. Lauschke's draft was already included in Figure 2 because it corresponds to that curve 5b in Figure 2, therefore I didn't see any need for repeating that Figure 3 in the application.

Q. Did you make any changes—did you make changes concerning the use of shortened fibers in the piecing point?

A. Yes, of course I made that.

Q. Why did you do that?

A. Well, basically, two reasons. The explanation in Mr. Lauschke's draft shows the fiber beard changes by the combing time along a determined curve and I really couldn't understand that there could be a more uniform fiber beard at any point of this curve with respect to any other point. I thought all the points are usable because they are on one curve, and therefore they are always showing and indicating a uniform fiber beard, and I talked about this with Mr. Fritz Stahlecker and he agreed with that version.

MR. ROUX: OBJECTION, Your Honor. Mr. Fritz Stahlecker was on the stand. This witness is going into what he discussed with Mr. Stahlecker and what Mr. Stahlecker agreed with him and told him.

THE COURT: He just said he agreed. He didn't say what they discussed.

MR. PARK: That's right. He's setting forth his reasons why the changes were made.

THE COURT: All right. OVERRULED.

Q. Go ahead, please, Mr. Dauster.

A. Mr. Stahlecker agreed that my view was right and that there shouldn't be any preferred point in that curve, and secondly there were not really any means diclosed [sic] which shortened the fiber beard. So I left the explanation of Mr. Lauschke in the division of the one unit and two units as possible and that maybe the time is longer, *but I didn't mention that this led to any specific advantage.* (Emphasis added).

MR. PARK: No further questions.

REBUTTAL CROSS EXAMINATION BY MR. ROUX:

Q. Mr. Dauster, isn't it a fact that the idea of piecing the shorter fibers became the subject matter of another Stahlecker patent?

A. Not that way as you are expressing it. The idea of using shorter fibers included means for shortening the fibers on the fiber beard, which is a kind of a sustitute [sic] to the preparation of uniform fiber beard.

Q. So it's another way of getting rid of fiber beard is that what you're saying?

A. It's another way, yes.

Q. But it did become the subject matter of another Stahlecker patent. Isn't that correct?

A. It is a different idea.

Q. Just answer my question, please, yes or no. Is it the subject matter of another patent application?

A. Yes, exactly.

Q. And that patent application was filed approximately two months after the '946 application was filed. Isn't that correct?

A. I don't know.

MR. ROUX: I have no further questions, Your Honor.

REBUTTAL REDIRECT EXAMINATION BY MR. ROUX [sic] (PARK):

Q. Mr. Dauster, what was the difference between this later filed application that Mr. Roux talked about and the '946 application?

A. The subject matter of the other invention is to cut off the fiber beard at a place which is out of the reach of the opening roller. So that by cutting off the fiber beard, this area, a new and known beard is created, but this is a different idea from the uniform fiber beard by controlling the time, the combing time.

MR. PARK: No further questions.

[Tr. 977–80].

The Defendants contend that the '946 Patent fails to disclose information, (i.e., that piecing with short fibers is an advantage), needed to perform the "best mode" known to the inventors as of December 7, 1974 for creating a uniform fiber tuft. According to Defendants, this undisclosed information was intentionally deleted and concealed.

The Court disagrees. The burden of proving that an inventor contemplated a mode better than he disclosed is on the challenger. *Hybritech*, 802 F.2d at 1384; 35 U.S.C. § 282. Further,

> Not complying with the best mode requirement amounts to concealing the preferred mode contemplated by the applicant at the time of filing. *In re Gay*, 309 F.2d 769, 772–73, 50 CCPA 725, 730–32, 135 U.S.P.Q. 311, 315 (1962). "[T]here is no objective standard by which to judge the adequacy of a best mode disclosure." *In re Sherwood*, 613 F.2d 809, 816, 204 U.S.P.Q. 537, 544 (CCPA 1980). Instead, "only evidence of concealment (accidental or intentional) is to be considered. That evidence, in order to result in affirmance of a best mode rejection, must tend to show that the quality of an applicant's best mode disclosure is so poor as to effectively result in concealment." *Id.* The purpose of the best mode requirement "is to restrain inventors from applying for patents while at the same time concealing from the public preferred embodiments of their inventions which they have in fact conceived." *In re Gay*, 309 F.2d at 772, 50 CCPA at 730, 135 U.S.P.Q. at 315. Compliance with the

best mode requirement exists when an inventor discloses his preferred embodiment.

*DeGeorge v. Bernier,* 768 F.2d 1318, 1324–25 (Fed.Cir.1985).

### The Control Element 42

■ The Defendants contend that the elements of the control element 42 of Fig. 3 of the '946 Patent known to the inventors as of December 7, 1974, was not disclosed in the '946 Patent. Defendants further contend that the Plaintiffs' failure to disclose these elements constitutes a failure to disclose the "best mode" of the apparatus and timing program of the '946 Patent for obtaining a uniform fiber tuft, and for performing a piecing operation according to the '946 Patent.

The Defendants also complain that the structure of the control element is not shown in the '946 Patent and that its function is only specifically recited in two portions of the '946 Patent.

Mr. Fritz Stahlecker, Dietar Böttcher, and Heinz Schultz testified that the control element 42 was a fully electronic brain, that the third prototype Spincat which was not constructed until after 1974, after the filing date of the original '946 application, contained more extensive electronics than was included on the 1974 prototype, confirming the inventors' lack of total satisfaction with the controls included on the 1974 prototype. [Tr. 75–76, 95–97, 138–140, 134–136]; Dieter Böttcher [DX 401, Day 2 pp. 50–51, 72–73, 79, 86–88, 96–99]; Heinz Schultz [DX 402, Day 2, pp. 13–18, 21–22, 43–44]; [DX 401, Day 2, pp. 96–99, 101; DX 402 Day 2, pp. 43–44].

The control means is described in the specification by reference to functions it must perform [PX 273, Col. 4, Line 66—Col. 5, Line 12; Col. 6, Lines 60–65, and Col. 7, Lines 4–9]. Figure 2 provides a general algorithm by which the control means should operate.

The Plaintiffs' expert, Bartlett, further testified:

Q. Mr. Platt has criticized the patent in suit for failing to disclose any structure for this control of 42. In your opinion, is that a fair criticism?

A. In the context of the disclosure and the invention and the subject matter as a whole in the patent in suit, '946, no, it's not a fair criticsim [sic].

Q. Why do you say that?

A. Well, the element 42 is shown as a box which is a manner of showing elements as commonly used in patent applications when you're showing something that may or may not be complicated but is not essential for understanding how the invention operates. It may be an important part in the invention, but it's not essential to understand how the invention operates by knowing what's in there and you use this box technique to simplify both the drawings and description. You notice these descriptions aren't what I would call blueprints. They're already simplified drawings, but it's a common technique that's used.

And when you take from the description in this patent, it clearly gives you the various function throughout the patent as a whole, that the element 42 has to perform, and moreover the left-hand side particularly of Figure 2 gives us a production control data chart, in effect, and if you take that production control data chart, the left-hand side of Figure 2, then coming into the right-hand side and the description of the functions that have to be performed by the various elements in the—other elements in the piecing carriage in the spinning machine, the element 42, the control element, is sufficiently identified.

If you gave—from my experience and in this respect, you know, I ran an electronics company here in Charlotte, making control systems for textile machines back in '69, before the date of this patent, and if you take the production control data of Figure 2, plus the description in this patent, I had an electronic engineer at that time that would draw you up a rough board on this in one day. It might take a week to make it, but that's no problem of someone of ordinary skill in the electronic control art.

MR. PARK: No more questions. [Tr. 1019–22].

The Court finds that the fact that the patentees did not disclose in their application the electra-mechanical control device present in the second prototype Spincat does not constitute any failure to disclose the best mode contemplated by the inventors for carrying out their invention.

*Cleaning the Rotor*

[26] The Defendants contend that prior to piecing, cleaning the spinning rotor was necessary in order to have an acceptable piecing point and that the evidence shows that the second SpinCat prototype cleaned the spinning rotor prior to piecing, and that such a cleaning was necessary in order to properly and successfully obtain a uniform fiber tuft. The Defendants further contend that the '946 Patent does not disclose that the piecing apparatus cleans the rotor as a prerequisite for creating a uniform fiber tuft, and that such failure constitutes a failure to disclose the "best mode" of the apparatus of the '946 Patent for creating a uniform fiber tuft and for performing a piecing operation according to the '946 Patent. Heinz Schultz, an engineer with Suessen, testified that in the Spincat prototype that cleaning of the rotor is important not only for fiber beard regulation but also for the yarn course—for the spinning process. [DX 402, Day 2, pp. 55–56].

Figure 3 of the Patent shows a vacuum source 8a referred to in Col. 4, Lines 34–37. The specifications of the '946 Patent, Col. 4, Lines 18–25 state:

> Since the spinning rotor is braked or stopped during the preliminary sliver feed operation, the fibers supplied to it are sucked away by means of an underpressure line, thereby preventing them from being deposited in the spinning rotor. The ring of fibers on which the return end of the thread is placed is thus formed only by the fibers supplied in the controlled sliver feed operation.

Col. 1, Lines 63–68 and Col. 2, Line 1 refer to the underpressure chamber where the spinning rotor runs. Col. 1, Lines 10–12 of the Patent also state: "If the spinning rotor is braked, the fibers reaching the spinning rotor are sucked away and removed."

The '946 Patent thus fully discloses that cleaning of the rotor is part of the process in obtaining a ring of fibers, formed only by fibers supplied in the controlled sliver feed operation, and on which the return end of the thread is placed.

*Thread Locating Means*

The Defendants claim that the "piecing means" of Claim 18 includes means for locating the thread end on the spool. The Defendants further contend that in the second Spincat prototype the locating means included a specifically designed suction nozzle, which was an important part of the Spincat and that the failure to disclose the suction nozzle in the second Spincat prototype constitutes a failure to disclose the "best mode" of the apparatus of the '946 Patent for creating a uniform fiber tuft and for performing a piecing operation according to the '946 Patent.

> The references to thread in Claim 18 are:
>
> Apparatus for *thread piecing* in an open-end spinning assembly comprising
>
> . . . .
>
> piecing means including means for introducing a thread end back into said spinning rotor . . .

Col. 5, Lines 33–36 states:

> Maintenance unit 6 picks up a thread end 33 from an unillustrated winding cone and returns it to spinning rotor 9 through a yarn removal channel 32, whereby it is placed on a fiber ring 31 in spinning rotor 9. Thread end 33 is returned by means of auxiliary draw-off rollers 34 and 35 of maintenance unit 6, of which at least roller 34 can be driven in either sense of rotation. Thread end 33 is sucked into spinning rotor 9 by means of the suction in underpressure chamber 8. The reversal of the sense of rotation of auxiliary draw-off roller 34 is controlled by means of a thread tension feeler 43 of maintenance unit 6.

That is not a part of the claim invention. That is, the function locating the broken yarn is not a part of the claimed invention in Claim 18 which is an improved apparatus for piecing. As is noted in Claim 18, it is not concerned with means by which thread pick up occurs, but with piecing.

*Vacuum*

■ The Defendants complain that "... no especially strong vacuum, and in fact *no vacuum at all,* is mentioned in the '946 Patent." The Defendants further complain that Plaintiffs' "... failure to disclose the increased vacuum constitutes a failure to disclose the 'best mode' of the apparatus of the '946 Patent for creating a uniform fiber tuft and for performing a piecing operating according to the '946 Patent."

Claim 18, Col. 10, Lines 1–4 very specifically states:

18. Apparatus according to claim 17, further comprising means for supplying a vacuum to said spinning rotor to remove any fiber supplied during said preparation of said spinning assembly by said preparing means.

Whether the relative terms "strong vacuum", "light vacuum", "extremely strong vacuum" or whatever is used, is of little moment. The point is that the patent calls for supplying a vacuum to the spinning rotor *to remove any fiber supplied during said preparation of said spinning assembly* by said preparing means.

Whatever descriptive term is used is irrelevant. The vacuum must be such as will remove the fiber supplied during the preparation of the spinning assembly—call it what you will—weak or strong.

6. *Inequitable Conduct.*

■ We now come to the sixth issue: "Is the '946 Patent unenforceable because of inequitable conduct before the U.S. PTO during the prosecution of the application for the '946 Patent?"

The Defendants, on this issue, complain that the Plaintiffs failed to disclose to the PTO the material information of the Barber–Colman license dated November 20, 1973. The Defendants contend that the agreement was material information because the SpinCat apparatus referred to therein was reduced to practice and anticipated or rendered obvious the subject matter of the '946 Patent. They also argue that in any event the use or sale of the SpinCat apparatus "could" still have been material prior art against which the patentability of the '946 application should have been measured. The Defendants further argue that the Plaintiffs failed to disclose to the PTO the "best mode" of the alleged invention of the '946 Patent known to them prior to the December 7, 1974 filing date of the '946 Patent, since there was a "best mode" embodiment of the Spincat which functioned in accordance with Claim 18.

The Defendants further contend that intent of failure to disclose should be inferred from the following circumstances:

1) Several aspects relating to the "best mode" of the '946 Patent were intentionally deleted from the draft application which served as the basis of the German priority document.

2) The "best mode" deleted from the '946 Patent application, *i.e.* that piecing with short fibers was a more advantageous way of practicing the alleged invention of the '946 Patent, appears in a subsequently filed patent application, clearly indicating an impermissible attempt at extending the patent monopoly of the '946 Patent.

3) No structure of the WST designed and manufactured control element appears in the '946 Patent, and a Suessen-related company wished to sell the electronics which made up the control element at a later date.

4) Plaintiffs and their attorneys are well-experienced in patent matters.

The Court disagrees with all the Defendants' contentions except Number 4, and finds that the Defendants have failed to produce clear and convincing evidence to support any of the first three contentions as has been previously discussed.

As to the last contention, the Court will agree that the Plaintiffs and their attorneys are well experienced in patent matters, but fails to see how that contention

demonstrates any evidence of intent to deceive.

Further, the Court notes:

The doctrine of inequitable conduct requires a trial court to undertake a two-step analysis. The trial court must discern whether the withheld references satisfy a threshold level of materiality. The court must also determine whether the applicant's conduct satisfies a threshold showing of intent to mislead. These initial determinations are questions of fact, which this court reviews under a clearly erroneous standard. Next, assuming satisfaction of the thresholds, the trial court must balance materiality and intent. The more material the omission, the less culpable the intent required, and vice versa. The trial court has discretion to determine inequitable conduct. This court reviews the discretionary determination under an abuse of discretion standard.

PTO Rule 56 is the appropriate starting point in determining the threshold level of materiality. This broad standard most closely delineates how an applicant ought to conduct business with the PTO. Information is material if there is "substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." 37 C.F.R. § 1.56 (1989). (Citations omitted).

*Halliburton Co. v. Schlumberger Technology Corp.*, 925 F.2d 1435, 1439–40 (Fed.Cir. 1991). The Court finds that none of the "omissions" were material.

Rule 1.56 as promulgated by the PTO provides:

**§ 1.56 Duty of disclosure; fraud; striking or rejection of applications.**

(a) A duty of candor and good faith toward the Patent and Trademark Office rests on the inventor, on each attorney or agent who prepares or prosecutes the application and on every other individual who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. All such individuals have a duty to disclose to the Office information they are aware of which is material to the examination of the application. Such information is material where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent. The duty is commensurate with the degree of involvement in the preparation or prosecution of the application.

37 C.F.R. § 1.56 (1989).

The Defendants claim that the applicants for the '946 Patent failed to disclose the following:

(1) The Suessen/Barber–Colman License Agreement dated November 20, 1973 and the circumstance surrounding that Agreement.

(2) The "best mode" of the alleged invention of the '946 Patent known to them as of December 7, 1974 filing date. Defendants claim that prior to that date there was a "best mode" embodiment in the Spincat which functioned in accordance with Claim 18.

The Court has discussed both these contentions and sees no purpose to be served in reiterating that discussion here. Suffice it to say that the Defendants have not met their burden of proof on either contention.

Therefore, the Court will find the '946 Patent to be enforceable.

7. *Literal Infringement by OFRS.*

[30, 31] Finally, we come to the seventh issue:

"Does the OFRS prefeed system infringe Claim 18 of the '946 Patent literally?"

The Court has considered the asserted claims of Claim 18 in the '946 Patent. In light of the preponderance of the evidence, (see Findings of Fact 57–69 *infra*), the Court concludes that when those claims are compared with the process of the accused OFRS that the OFRS infringes literally on Claim 18 of the '946 Patent. *See Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476 (1984). Defendants further contend that Defendants' activities in the United States with respect to the OFRS were temporary and *de minimis*, as the Defendants modified the OFRS in such a manner that the

Plaintiffs agree that it does not literally infringe the '946 Patent. However, "... mere voluntary cessation of allegedly illegal conduct does not moot a case." *United States v. Concentrated Phos. Exp. Ass'n,* 393 U.S. 199, 202, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). The Court will stay any further action as to damages in the matter of the literal infringement by the OFRS until after the appellate process has been completed.

### CONCLUSION

In conclusion, the Court finds:

1. Defendants' OFRS *does* literally infringe Claim 18 of the '946 Patent. Further proceedings concerning damages on this issue, as well as Plaintiffs' antitrust claims, are *STAYED* pending the completion of the appellate process.

2. Defendants' NFRS in either the first or second attempt mode does *not* infringe literally or under the doctrine of equivalents Claim 18 of the '946 Patent.

3. The '946 Patent is *not* invalid under 35 U.S.C. Sec. 103 or Sec. 102(b), or Sec. 112.

4. The '946 Patent is *not* unenforceable because of inequitable conduct before the U.S. PTO.